Imogene M. ROGERS, petitioner,
Respondent,

v.

Robert L. ROGERS, Appellant.

No. 50104.

Supreme Court of Minnesota.

Aug. 29, 1980.

Meagher, Geer, Markham, Anderson, Adamson & Flaskamp and O. C. Adamson II, Lapp, Lazar, Laurie & Smith and Raymond M. Lazar, Minneapolis, for appellant.

Edward M. Cohen, Minneapolis, for respondent.

Heard before SHERAN, C. J., and PETERSON and YETKA, JJ., and considered and decided by the court en banc.

PETERSON, Justice.

This is an appeal from a judgment and decree in a marriage dissolution. The only issue raised is whether the interest in a closely-held Subchapter S corporation was properly valued by the trial court for purposes of a property settlement. We reverse and remand for more specific findings not inconsistent with this opinion.

Appellant, Robert L. Rogers, and respondent, Imogene M. Rogers, were married on September 30, 1944. For the first several years of their marriage, respondent was employed full time as a teacher while appellant served in the military and while he earned a degree in engineering. Thereafter, except for occasional part-time projects, respondent remained in the home as a wife and mother.

In 1967, appellant and an associate, Frank Freels, acquired ownership in an engineering services company which they renamed Rogers, Freels & Associates (RFA) and later incorporated. In recent years, RFA has become a highly successful expert engineering services business.

In 1970, appellant and Freels entered into a buy-sell agreement. The agreement, as amended by the shareholders in 1973, provides that when a shareholder wishes to sell his stock or leave full-time employment with RFA he must first offer his stock to RFA or its shareholders at a price fixed by formula; if a shareholder dies, the shareholder's estate must first offer his stock to RFA at a price fixed by formula. The formula price sets the value of the stock at a moving average of the greater of one and one-half times equity or two and one-half times profit.

Freels left RFA in 1974 and, pursuant to the buy-sell agreement, sold his 36% of the stock to RFA for approximately $92,000. Thereafter, Robert Radke joined RFA as manager and presently owns approximately 15% of the outstanding stock, subject to the buy-sell agreement. Appellant owns the remaining 85% of the stock.

In 1978, respondent petitioned for dissolution of her marriage to appellant. The dissolution was uncontested, but in 3 days of testimony the value of appellant's interest in RFA was sharply disputed, based upon divergent theories of the proper method of valuation. Appellant relied upon the terms of the buy-sell agreement to establish the value of his shares. The current purchase price of the shares under the agreement is approximately $254,000.[1]

Respondent, on the other hand, relied upon expert testimony by a certified public accountant, Thomas Kaliher, who used three methods of valuation and then averaged the results obtained. Under the first

---

1. In 1976, the corporation elected to be taxed as a Subchapter S corporation under I.R.C. §§ 1371–1378. Under this status, corporate profits are distributed to the shareholders as earned income and any undistributed earnings are treated as undistributed taxable income, not as equity. As a result, the annual corporate profits will appear deceptively low and equity will not increase. Accordingly, the purchase price under the buy-sell agreement formula will probably not rise significantly above the current $254,000 price.

method, Kaliher took the average net earnings of RFA for the years 1974 to 1977 but added back the salaries of the officers, on the theory that the salaries were discretionary and would be considered income by a buyer who wished to manage the business himself. The net income was divided by a .25 risk factor, based upon Kaliher's assumption that RFA was a service business largely dependent upon a few key people.[2] By adding the net worth of RFA to this adjusted net income, Kaliher arrived at a total value of $984,343, and appellant's 85% share was therefore valued at $836,692. This method assumes that RFA will be sold and that the buyer will wish to avail himself of the salaries and earnings.

The second method used by Kaliher assumes the buyer will not operate the company by himself, so a portion of the salaries was excluded from net income. Then, because the retention of some key employees would decrease the risk, the risk factor was lowered to .125. Otherwise, calculations were made as in the first method, and appellant's interest was valued at $540,633.

The third method took as its premise that appellant is the key man in RFA and that the business would be valueless without him. Therefore, Kaliher reasoned, the only value of RFA is its potential for income to appellant. Accordingly, Kaliher took appellant's average salary and his share of the corporate earnings over the previous 4 years, estimated a remaining working life of 11 years, and calculated the present value of those 11 years of earnings. The resulting value was $863,155. The average of the results of the three methods was $746,826.

The portions of the trial court's findings of fact and conclusions of law relevant to this appeal are as follows:

[Finding No.] 27. That the [appellant] is the president of Rogers, Freels & Associates, Inc., which is a corporation special-

izing in the sale of engineering service; that the [appellant] is the owner of approximately eighty-five (85%) percent of the corporation known as Rogers, Freels & Associates, Inc.; that the value of the [appellant's] eighty-five (85%) percent interest in Rogers, Freels & Associates is approximately $600,000.00.

28. That the [appellant] has earned the following income for the years as set forth:

```
1974—$ 80,497.00
1975—$138,859.00
1976—$136,871.00
1977—$111,577.00
1978—$ 62,942.50 (6 months)
```

[Conclusion No.] 21. That the [appellant] is awarded all right, title to, and interest in his eighty-five (85%) percent interest in Rogers, Freels & Associates, Inc.

22. That as and for a property settlement, [appellant] shall pay to [respondent] the sum of $250,000.00 in cash, upon entry of the Judgment and Decree herein, or in the alternative, the sum of $25,000.00 annually for ten (10) consecutive years, bearing interest at the rate of eight (8%) percent per annum on the unpaid balance, from date of entry of the Judgment and Decree herein, each annual installment being due and payable on the 1st day of January of such year, including interest accrued to that date, with the first payment due the 1st day of January, 1979.

In the event [appellant] dies before the entire sum is paid in full to petitioner, the remaining unpaid balance, plus interest accrued, shall become a lien upon his estate and shall be due and payable to [respondent] from [appellant's] estate before any and all other payments are made therefrom.

23. That as and for alimony, [appellant] shall pay to [respondent] the sum of $2,000.00 per month, commencing the 1st

---

2. The risk factor is used to reflect the annual rate of return a buyer would demand on his investment.

day of each month until such time as [respondent] marries or dies, whichever event shall first occur.

Appellant moved to amend several of the findings and conclusions, but only minor changes were accepted by the court.[3]

On appeal, appellant contends that Finding No. 27, which valued appellant's 85% interest in RFA at $600,000, and Conclusion No. 22, which, based upon Finding No. 27, awarded respondent $250,000 for her share of appellant's business, grossly overvalue appellant's interest in RFA and are therefore clearly erroneous. Appellant argues that the buy-sell agreement should have been dispositive of the value of his stock and that, even if it were not dispositive, the trial court's valuation was based upon improper considerations.

■ 1. We turn, first, to appellant's contention that the purchase price of $254,000 established by the buy-sell agreement is dispositive of the value of appellant's stock. Appellant argues that the value of the business is irrelevant—if he wishes to sell his interest, he can receive only $254,000 for the stock. However, although appellant does not have the power to modify the agreement unilaterally, it is not improbable from a practical standpoint that, as 85% owner and president of RFA, he could exert substantial influence over the other shareholder to assent to a modification of the agreement. We note, too, that because of the Subchapter S status, the agreement price formula will in all probability undervalue the stock,[4] and it may well be to the future business advantage of both shareholders to modify the formula to reflect the

true value of the stock. Moreover, if RFA were to sell its business for cash, the corporation could be dissolved and appellant's return on his stock would reflect the actual value of his interest, without the artificial limits imposed by the buy-sell agreement. Therefore, the trial court was not required to accept the current purchase price of $254,000 established by the buy-sell agreement as dispositive of the value of appellant's interest in RFA.

On the other hand, the buy-sell agreement cannot be completely ignored. If appellant could not induce a modification of the agreement, or if he does not wish to sell the business, or if he shouuld die before realizing the potential profits from the business, the buy-sell agreement will limit the price of the stock to $254,000, while the award to respondent would remain at $250,000, far more than one-half the purchase price of the stock. It would seem, therefore, that the award to respondent should in some way reflect the unique contingencies affecting the value of appellant's stock.

■ 2. We also discern, in the analysis and conclusions offered by Kaliher, respondent's expert witness, substantial flaws that in our opinion substantially reduce the weight of his appraisal of the value of appellant's interest in RFA. First, Kaliher gave no consideration to the buy-sell agreement, which, although not dispositive, should have been a factor in the analysis. Second, Kaliher's valuation methods incorporated several improper considerations. In his first method, Kaliher included in his calculation of annual net income the salaries of officers of RFA. The net income of

3. Conclusion No. 22 was amended to read:

That as and for a property settlement, [appellant] shall pay to [respondent] the sum of $250,000.00 in cash, upon entry of the Judgment and Decree herein, or in the alternative, the sum of $25,000.00 annually for ten (10) consecutive years, bearing interest at the rate of eight (8%) percent per annum on the unpaid balance, from date of entry of the Judgment and Decree herein, each annual installment being due and payable on the 1st day of January of such year, with the first payment

due the 1st of January, 1979, and that the interest thereon shall be allowed to accrue throughout the ten year period and shall be payable on the 1st day of January of each of the eleventh, twelfth and thirteenth consecutive years, in the amount of $25,000.00 in cash in each of the eleventh and twelfth years and the entire remainder of interest then due in the thirteenth year.

4. See, footnote 1, supra.

a corporation, however, should not include the salaries of its employees and officers, except as those salaries may reflect a distribution of profits. Even if a buyer expected to manage the business and receive the salary himself, he would not consider the salary as part of the corporate earnings. By including reasonable compensation for appellant's services in the net income calculation, Kaliher's method ran contrary to our decision in *Roberson v. Roberson*, 296 Minn. 476, 477, 206 N.W.2d 347, 348 (1973), where we stated that "attaching a value to a business by capitalizing its income ordinarily requires exclusion of the value of personal services rendered by the owner." Kaliher's second method, which also included a portion of the officers' salaries in the computation of net income, is flawed in the same manner.

Similarly, the third method, in which Kaliher took the present value of appellant's earnings over the next 11 years of his working life, is invalid because Kaliher did not exclude that portion of appellant's annual income that represents reasonable compensation for his services. If the trial court accepted this valuation, it not only awarded to respondent alimony based upon appellant's future income but also awarded, by way of property settlement, an additional 40% of the present value of appellant's future income. This would clearly be improper under *Roberson*. Respondent is entitled to property acquired during the marriage, but she is not entitled to a lien on appellant himself. The third method is therefore unsatisfactory to the extent that it capitalizes as property appellant's future salary.

3. The third major defect in Kaliher's methodology is his apparent failure to take into account appellant's importance to RFA. Kaliher applied a purely arbitrary risk factor in his calculations and there is no indication that factor bore any relationship to the importance of appellant to the continuing success of RFA. While the testimony did not establish that RFA would be worthless without appellant, it is clear that appellant is a key man—if not *the* key man—in RFA, and the profitability of the corporation could be substantially reduced if he were to leave. However, the valuation of appellant's share of RFA should not be based upon the assumption that appellant will remain. Such an assumption would compel appellant to continue with RFA, perhaps against his wishes, simply in order to earn enough money to pay for the award to respondent.

The property acquired during marriage should be limited to that portion of the value of RFA that is not dependent upon appellant's continued services. To capitalize the earnings of RFA on the assumption that appellant will continue to contribute his talents and services is, essentially, to capitalize appellant. An award made on this basis would, in effect, give respondent a forced share of appellant's future work. If appellant were to become disabled and RFA lost its earning capacity, appellant's interest would be worth substantially less than Kaliher's valuations, but because the award to respondent was a "property" award, the court could not subsequently change the award to reflect the changed circumstances. *Mikkelsen v. Mikkelsen*, 286 Minn. 520, 522, 174 N.W.2d 241, 243 (1970).

4. It may be that the valuation found by the trial court reflects an independent analysis not influenced by the flaws we have noted. Unfortunately, however, the court provided no explanation of its findings, and we therefore do not know upon what basis it concluded that appellant's interest in RFA was worth $600,000. It is for this reason that we remand the case for reconsideration and more specific findings.

We recognize the difficulty of valuing appellant's business, especially on the record made at trial. We commonly accord substantial deference to the findings of the trial court and recognize that in a matter such as this exactitude is not possible. In

these circumstances, however, we believe that certain considerations should be taken into account in formulating an award that would give to respondent her fair share of the value of the business appellant built during their marriage but at the same time would not overvalue the business in light of the contingencies to which it is subject.

We also believe that the buy-sell agreement, while not dispositive as to value, should be considered in determining the form of the award. Although, as respondent points out, it is speculative that appellant might die or become disabled before he realizes the full value of his interest in RFA, it would seem unfair to award respondent a fixed amount based upon the most optimistic appraisal of the circumstances. It would be more appropriate, we believe, to make a present award to respondent of her share of the $254,000 purchase price set by the buy-sell agreement, which represents the minimum appellant will realize on his stock.[5] The decree could then provide for a future adjustment in the award to augment respondent's share if appellant lives out his expected working life, or if he sells RFA or modifies the buy-sell agreement.[6] Finally, the trial court is not precluded from reconsidering the award of alimony after re-evaluating the property settlement.

Reversed and remanded with instructions.

Costs and attorneys fees are not allowed to either party.

AMDAHL, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

---

5. This amount could be paid in full or in installments, as the trial court deems appropriate.

6. In any event, respondent's share should reflect only the court's estimation of the value of the business at the time of the decree. Her award should not, of course, be affected by any increase or decrease in the value of the business that occurs after the dissolution.