In re the Marriage of Shirley M.
BATEMAN, petitioner,
Respondent,

v.

William G. BATEMAN, Appellant.

No. C8–85–783.

Court of Appeals of Minnesota.

Feb. 18, 1986.

Review Denied April 24, 1986.

Michael T. Feichtinger, St. Cloud, for respondent.

L. Michael Hall, St. Cloud, for appellant.

Heard, considered and decided by PARKER, P.J., and FORSBERG and NIERENGARTEN, JJ.

## OPINION

NIERENGARTEN, Judge.

William Bateman appeals from a judgment and decree entered on March 25, 1985 determining property, spousal maintenance, and child support issues in a bifurcated dissolution proceeding. William disputes the trial court's determinations, claiming that the trial court (1) improperly valued his insurance agency; (2) erroneously characterized some property as marital or, in the alternative, erroneously calculated his non-marital share; (3) erroneously distributed non-marital assets without making a finding of undue hardship; (4) abused its discretion in awarding the homestead to the parties as tenants in common; (5) abused its discretion in awarding Shirley spousal maintenance; and (6) generally failed to distribute property in a just and equitable manner. Shirley Bateman filed a notice of review challenging the judgment and decree entered on December 20, 1983 dissolving the marriage and resolving child custody and visitation issues as well as the judgment and decree of March 25, 1985. Shirley claims the trial court erred by making what in fact amounted to an award of joint legal and physical custody of the children absent evidence of the parties' ability to cooperate. Shirley further claims the trial court erred by requiring her to reside in the school district of her residence and by providing that her award of spousal maintenance terminates if she cohabitates with an individual of the opposite sex. We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

## FACTS

Appellant William Bateman and Respondent Shirley Bateman were married on April 7, 1971. After bifurcated hearings, the marriage was dissolved and child custody and visitation matters established in a judgment and decree entered December 20, 1983. The trial court awarded Shirley sole legal and physical custody of the parties' two daughters from December 20, 1983 until July 15, 1986 and William sole legal and physical custody of the two minors from July 16, 1986 until July 15, 1988, with the direction that thirty days prior to the expiration of William's custody, the trial court will review custody issues. At the time the judgment and decree was entered in 1983, the parties' daughters were ages ten and eight. The trial court also directed the parties to cooperate with each other in making major decisions concerning the minor children. The trial court determined property, spousal maintenance, and child support issues in its judgment and decree entered on March 25, 1985. At the time the second judgment and decree was entered, William was 43 years old and Shirley was 44. The parties have two daughters, both of whom are under age 18, and one son from Shirley's former marriage who William adopted and who has attained the age of 18.

William is a life insurance sales person who has been in the business since 1963, and who, in 1976, started his own agency, the "Bill Bateman Agency." William is an independent agent for Northwestern National Life Insurance Company, and a large portion of his business is comprised of selling policies for Northwestern.

For most of the duration of the parties' marriage, Shirley was a full-time homemaker, although she did have part-time employment from time to time. Her most recent employment outside of the home consisted of temporary full-time secretarial work for the City of St. Cloud. Shirley has also worked as a legal secretary, interior decorator, and editor of a shopping newspaper, a job for which she earned $65 bi-weekly. Shirley has a B.S. degree in education, and prior to the parties' marriage taught art and english in the secondary grades of the Wheaton School District. Although her teaching certificate is for life, Shirley has been unable to obtain a teaching job in the St. Cloud area, with the exception of some occasional substitute teaching. Shirley has also obtained a real estate license, which she is about to lose.

Prior to the disposition of the parties' assets, a trial was held in November 1984, at which two expert witnesses testified as to the value of the Bill Bateman Agency.

A certified public accountant, without objection, testified for Shirley as to the value of the Bill Bateman Agency using three different approaches. Under the unweighted capitalized net earnings approach, the accountant averaged William's net income for five years (1979–1983) to arrive at a figure of $53,546. In order to determine the net worth or the value in today's economy, the accountant multiplied the average by a ten percent rate of return to arrive at a value of $535,456.

The accountant also utilized the weighted capitalized net earnings approach, assigning "weights" to William's yearly net incomes from 1979 to 1983, with a weight of one assigned to 1979 and five assigned to 1983. After multiplying each year's net income by its assigned weight, the accountant added the figures together and divided that sum by fifteen, the total number of weights. This calculation resulted in a weighted average of $63,736, which when multiplied by a ten percent rate of return resulted in an agency value of $637,000. The accountant testified that the weighted net earnings approach is appropriately used when net income has increased in recent years because it gives more weight to those years.

Finally, the accountant employed the gross income approach, pursuant to which she multiplied the agency's 1983 gross income of $133,512 by a factor of one to reach an agency value of $133,512, which constitutes the gross income the agency can generate.

The accountant testified that the contract renewal method of valuation is appropriate in cases in which the business is being terminated or sold or the owner is retiring but that this method was inapplicable because the Bateman's agency was to be treated as an ongoing business. The accountant made no deductions for salary.

A certified public accountant testifying for William computed his valuation based on the assumption that William would retire and that the agency would be sold, and thus attempted to arrive at the price a disinterested third party would pay for the agency at an arm's length transaction. Because of the personal nature of the business, this witness used the renewal commissions, the renewals, and goodwill to arrive at an agency valuation of $32,000.

In the judgment and decree of March 25, 1985, the trial court valued William's insurance agency at $141,000. The trial court's memorandum notes that considerable testimony and evidence were received by the court regarding the value of the agency, and states that "[t]his testimony and evidence established an enormous disparity in valuation, from a high valuation of $637,000 to a low valuation of $32,000." Recognizing that William represents a substantial portion of the value of the business because of his diligence and effort with respect to the development and earning capacity of the business and that William will remain active in the business or will place a value on it that will force another to provide services to the business, the trial court rejected the $637,000 valuation submitted by Shirley's expert. In its memorandum, the court also determined "that a business that has average income of $53,-

500 per year for the past five years and currently (1983) earns the Respondent [William] in excess of $133,000, and whose value of renewal commissions alone is in excess of $29,000 * * * should carry a value in excess of $32,000.00 [valuation submitted by William's expert]." Accordingly, the trial court valued the business at $141,000, $114,000 of which constituted good will, the amount of the adjusted 1983 earnings.

The trial court then divided the parties' property as follows:

| Value of Marital Property Awarded to William Bateman | His Value | Her Cash Payment |
|---|---|---|
| Bill Bateman Agency ($141,000 value) | $70,500.00 | $70,500.00 |
| William-Michael Properties ($141,476) | 65,738.00 | 65,738.00 |
| Bateman, Dolan, Westlund ($1,801.00) | 900.50 | 900.50 |
| Keogh Plan ($4,000.00) | 2,000.00 | 2,000.00 |
| Northwestern National Life Pension Rollover ($19,851.00) | 9,925.50 | 9,925.50 |
| William's Pension Plan ($10,649.00) | 5,324.50 | 5,324.50 |
| Condominium ($6,450.00 negative equity) | (3,225.00) | (3,225.00) |

| Value of Non-marital Property Awarded to William Bateman | | |
|---|---|---|
| Bateman Garage Partnership | $57,882.00 | |
| Massachusetts Cash Management Fund | 31,074.00 | |
| Note Receivable, Lyle Bateman | 20,000.00 | |
| Homestead Interest | 6,000.00 | |
| Kemper Fund | 743.00 | |
| William-Michael Properties ($141,000.00) | 14,000.00 | |
| Anderson, Bateman & Dolan ($7,835.00) | 4,335.00 | $3,500.00 |
| Hunting shack | 1,000.00 | |
| Agency Furniture | 1,115.00 | 1,000.00 |
| Total | $136,149.00 | $4,500.00 |

The trial court also awarded Shirley $1,000 per month for a period of six years, "provided, however, that said maintenance shall cease upon [Shirley's] death, remarriage or cohabitation with another individual of the opposite sex."

The trial court awarded the parties' homestead in equal shares to Shirley and William as tenants in common, with physical possession and the right of occupancy to be in the party with custody of the children. After William's custody period expires in 1988, the party having custody is to possess and occupy the homestead until the younger child reaches majority or completes high school, whichever occurs later. Upon attainment of majority or graduation of the younger daughter, the parties are to sell the homestead. The sale proceeds are first to be used to pay unpaid mortgages, incumbrances, and costs of sale. William is to then take $6,000 for his non-marital interest, and the remaining balance is to be divided equally.

William moved for amended findings or, in the alternative, a new trial. Following a hearing, the trial court denied the motion. William appeals from the denial of that motion and the judgment and decree entered on March 25, 1985. Shirley filed a notice of review challenging provisions of both the March 25th decree and the decree entered on December 20, 1983.

## ISSUES

1. Was the trial court's valuation of the Bill Bateman Agency clearly erroneous?

2. Did the trial court err in apportioning the William-Michaels Properties between marital and non-marital interests given that the asset was acquired in an exchange for a non-marital asset?

3. Did the trial court err in distributing a portion of assets found to be non-marital without making a finding of undue hardship?

4. Did the trial court abuse its discretion in awarding the homestead to the parties as tenants in common and postponing the sale of this asset for at least eight years?

5. Did the trial court abuse its discretion in awarding Shirley spousal maintenance in the amount of $1,000 per month for six years?

6. Did the trial court clearly err in its findings of fact on child custody?

7. Did the trial court err by requiring Shirley to maintain her residence in the St. Cloud School District?

8. Did the trial court abuse its discretion by providing that Shirley's spousal maintenance shall terminate if Shirley cohabitates with another individual of the opposite sex?

## ANALYSIS

### I.

■ A trial court's valuation of a business in a dissolution action is a finding of fact that should not be set aside on appeal unless clearly erroneous. *See Hertz v. Hertz*, 304 Minn. 144, 145, 229 N.W.2d 42, 44 (1975). Specifically, the Minnesota Supreme Court has stated that:

Assigning a specific value to an asset is a finding of fact; disputes as to asset valuation are to be addressed to the trier of fact, and conflicts are to be resolved in that court. * * * Such findings of fact, when made without a jury, shall not be set aside unless clearly erroneous on the record as a whole.

*Id.* (citations omitted). So long as the trial court's determination of market value "falls within the limits of credible estimates made by competent witnesses," this court must sustain the determination "even if it does not coincide exactly with the estimate of any one of them." *Id.*

William contends the trial court committed reversible error by attaching a value of $141,000 to the Bill Bateman Agency when its correct value is $32,000. William asserts the trial court failed to exclude the value of William's personal services in valuing the agency as is required under *Rogers v. Rogers*, 296 N.W.2d 849, 853 (Minn. 1980), and *Roberson v. Roberson*, 296 Minn. 476, 477, 206 N.W.2d 347, 348 (Minn. 1973). William argues that he is the "key person" in his agency, and thus in order to value his business, his income must be excluded from consideration because failure to do so creates a "lien on his services." In addition, William argues that basing valuation on income is unfair because his 1982 and 1983 incomes are unusually high due to a change in Northwestern's commission payment schedules and because in 1982 and 1983 he earned more commissions than usual because he converted a large number of whole life policies to universal life policies.

William insists that the trial court's valuation effectively shackles him to his business for years beyond the date of the order because the trial court considered his income. William asserts that in order to determine the fair market value or the present cash value of the asset, valuation should be based on the renewal commissions and a nominal amount of good will, items utilized by William's expert witness in arriving at a present value of $32,000.00. William reasons that a person buying the agency would receive only the right to receive renewal commissions, which in 1983 amounted to $13,300.00, ten percent of the year's gross income, plus the agency's fixed assets and goodwill, which would be minimal without appellant's services.

Shirley counters that the trial court's $141,000 valuation is within the credible estimates made by competent witnesses. Shirley's expert witness used three different valuation methods, all of which involved the capitalization of income, which she contends, do not impermissibly shackle William's earning capacity.

In this case, the tangible asset at stake is the insurance policies the agency sells to an established clientele. Shirley asserts that "[t]he income produced by the Bill Bateman Agency is not exclusively attributable to appellant's services, but instead, is a result of the insurance policies developed and written by insurance companies not under the control of appellant," and thus, the trial court did not err in its valuation.

In *Rogers*, the Minnesota Supreme Court considered a wife's valuation of a closely held corporation in which the husband was a key person in an engineering services company, a service business largely dependent upon a few key people. *Rogers*, 296 N.W.2d at 850–51, 853. The entire business income was derived from the performance of their personal services. *Id.* The wife's attorney utilized three methods of valuation, all of which considered employee salaries or portions thereof. *Id.* at 850–51. The Minnesota Supreme Court concluded that methods were flawed because they relied on the reasonable compensation for the services of the key people, thus running afoul of *"Roberson v.*

*Roberson* * * * where we stated that 'attaching a value to a business by capitalizing its income ordinarily requires *exclusion of the value of personal services rendered by the owner.'* *Id.* at 853 (citation omitted; emphasis added). *See also Roberson v. Roberson,* 296 Minn. 476, 477, 206 N.W.2d 347, 348 (1973) (valuation by capitalization of income requires exclusion of the value of the owner's personal services); *Robinson v. Robinson,* 355 N.W.2d 737, 740 (Minn.Ct.App.1984), *pet. for rev. denied,* (Minn. Jan. 4, 1985) (capitalization of individual compensation is impermissible).

■ We find that the trial court improperly considered the valuations submitted by Shirley's expert, all of which were calculated based upon the capitalization of William's personal services as evidenced by his net income. If William's agency employed other workers, and thus William's income was derived from profits arising from ownership as well as compensation for his personal services, it would not be improper to capitalize the earnings from the agency arising from William's ownership of the agency. *See Robinson,* 355 N.W.2d at 740. Such is not the case here, however. William has no other employees. Any valuations based on the capitalization of William's income are inappropriate and may not be considered. The trial court, thus, erred in considering the $637,000 value submitted by Shirley's expert witness.

■ The trial court refused to value the insurance agency at $637,000 because it recognized that William's diligence and effort are substantial factors in the earning capacity of the business. The trial court also rejected William's valuation of $32,000, finding that a business that earned in excess of $133,000 in 1983 and averaged $53,500 per year in the last five years and possesses renewal commissions valued in excess of $24,000 should have a value greater than $32,000. In valuing an asset for purposes of marital dissolution, market value of the asset is controlling. *See Lammi v. Lammi,* 348 N.W.2d 372, 374 (Minn. Ct.App.1984). The trial court failed to use market value when it based its determination on the agency's income.

■ In addition, it appears that the trial court, after determining that $637,000 was too high and $32,000 too low, assigned $114,000 as goodwill and found the total value of $141,000. Particularly troublesome is the trial court's inadequate explanation as to why $141,000 is appropriate. *See Balogh v. Balogh,* 356 N.W.2d 307, 313 (Minn.Ct.App.1984). We conclude that the trial court's decision to utilize the $141,000 figure was arbitrary. *See id.* Therefore, we find the trial court's valuation to be clearly erroneous.

For these reasons, we reverse and remand the case for reconsideration and more specific findings. On remand the trial court shall disregard valuations based on the capitalization of William's income. We direct the trial court to take additional evidence from the parties as to the value of the insurance agency.

## II.

The trial court has broad discretion with respect to property settlements and will be reversed only for a clear abuse of discretion. *Damman v. Damman,* 351 N.W.2d 651, 652 (Minn.Ct.App.1984). *See also Bogen v. Bogen,* 261 N.W.2d 606, 609 (Minn. 1977). The trial court found that an asset known as William-Michael Properties was acquired by the parties during their marriage, and that the parties' share of this asset was worth $145,476.00, but that of that amount, William made a $14,000.00 non-marital contribution to the partnership, resulting in a marital asset worth $131,476.00.

Prior to the parties' marriage, William acquired an eight-unit apartment building for an original investment of $14,000.00. In 1977 the building had an equity interest of $37,000.00. In exchange for the building, William acquired an interest in Majestic View, which is the most valuable asset of the William-Michael Properties partnership. Thus, by contributing his $37,000.00 equity from the eight-unit apartment building, William became a part of William-Mi-

chael Properties. William summarizes by stating that "[his] purchase of Majestic View was the acquisition of property in exchange for the increase in value of property which was acquired before the marriage."

■ The party wishing to establish the non-marital character of an asset has the burden of proof. *Van de Loo v. Van de Loo*, 346 N.W.2d 173, 177 (Minn.Ct.App. 1984). Non-marital property is defined in part as property acquired before the marriage. Minn.Stat. § 518.54, subd. 5 (1984). William argues he has satisfied this burden by showing that his William-Michael Partnership interest is non-marital because it was acquired in exchange for the increased value of the non-marital eight-unit apartment building. Moreover, William asserts that the evidence does not sustain the trial court's finding that monies and energies of both partners were expended to sustain the asset. According to William, the non-marital asset was not transformed into a marital asset. Moreover, William points out that Shirley cites no authority making relevant her argument that William's time and effort managing Majestic View was to the detriment of the parties' marital relationship.

Should this court agree that the partnership interest is marital, William's alternate argument is that the trial court erred in valuing his non-marital asset at only $14,000.00 under *Schmitz v. Schmitz*, 309 N.W.2d 748 (Minn.1981). William argues that his non-marital share should not be limited to the value of the original investment of $14,000.00. In *Schmitz*, the Minnesota Supreme Court determined that the husband was entitled to the entire increase in equity of his non-marital contribution to the parties' homestead. *Schmitz*, 309 N.W.2d at 750. Based on the formula established in *Schmitz* to determine the present value of a non-marital asset used in the acquisition of marital property, William claims that the present value of his non-marital asset is $55,000.00.

Shirley's argument is simply that property acquired during marriage is presumed to be marital, unless overcome by a showing that it is non-marital. *See* Minn.Stat. § 518.54, subd. 5 (1984). According to Shirley, marital assets were expended to sustain the William-Michael Properties, and the evidence supports the trial court's characterization.

■ We find that the trial court abused its discretion in characterizing the William-Michael partnership as marital property. While property acquired during marriage is presumed to be marital, the presumption may be overcome by a showing that the property is non-marital in nature. Minn.Stat. § 518.57, subd. 5 (1984). Non-marital property is, in part, property acquired before marriage, property acquired in exchange for property acquired before marriage, or the increase in value of property acquired before marriage. *Id.* subd. 5(b), (c). The record is clear that the partnership interest was acquired in exchange for William's apartment unit, which he purchased before marriage. The record also reveals that no marital assets were ever utilized in maintaining the partnership interest. We conclude, therefore, that William sustained his burden of proving the non-marital character of the partnership interest. We reverse and remand, noting that trial court may award Shirley part of the partnership if it finds unfair hardship. *See* Minn.Stat. § 518.58 (1984).

### III.

■ A trial court may apportion a spouse's non-marital property in order to avoid "unfair hardship" for the other spouse. Minn.Stat. § 518.58 (1984). The trial court awarded William non-marital assets consisting of an asset known as the "Anderson, Bateman & Dolan Partnership" and agency furniture. The court recognized that William purchased these assets with inheritance monies. The court found, however, that Shirley made a "substantial contribution" to these assets which did not transform them into marital assets but enhanced their value. Consequently, the trial court awarded Shirley cash to compensate her for her contributions.

William questions the relevancy of Shirley's "substantial contribution" as the court squarely stated that William purchased these assets with inheritance monies. Because the court made no finding of unfair hardship, William claims he alone is entitled to these assets.

Shirley contends the trial court did not err because the inherited funds were not placed in a separate account, but were instead commingled with marital funds, thereby changing these assets to marital property because the assets were not readily traceable to the inherited monies.

The trial court properly concluded that the Anderson, Bateman & Dolan Partnership and the agency furniture were William's non-marital assets. The court abused its discretion, however, by awarding Shirley an interest in these assets in the form of a cash payment without making a finding of undue hardship. Because these assets are traceable as non-marital and the trial court improperly apportioned them, we reverse the trial court's determination.

### IV.

■ In property divisions the principle of finality governs. *See* Minn.Stat. § 518.64, subd. 2 (1984). Continued undivided interests breed strife and litigation. *Wos v. Wos*, 291 Minn. 404, 406, 191 N.W.2d 829, 830 (1971). According to William the trial court's disposition of the homestead violates this principle because its sale is delayed until the younger daughter reaches the age of majority or graduates from high school, which means at a minimum eight years. Moreover, William claims that no reason exists to defer disposition because sufficient assets exist to dispose of all the parties' property at the present time.

Shirley does not object to the trial court's disposition of the homestead. Shirley is opposed, however, to an award giving her sole ownership of the homestead, for the reason that she cannot afford 100% of the maintenance and upkeep.

■ The trial court is accorded broad discretion in disposing of property. Here we cannot say that the trial court's disposition of the homestead was a clear abuse of discretion. Accordingly, we affirm the trial court's decision as to this matter.

### V.

A trial court has broad discretion in awarding spousal maintenance. *Swanstrom v. Swanstrom*, 359 N.W.2d 634, 636 (Minn.Ct.App.1984). "There must be a clearly erroneous conclusion that is against logic and the facts on record before this court will find that the trial court abused its discretion." *Id.* (citations omitted).

Minn.Stat. § 518.552, subd. 1 provides that maintenance shall be awarded if the spouse seeking it lacks sufficient property to provide for reasonable needs and is unable to adequately support himself or herself considering all relevant circumstances or is the custodian of a child whose condition makes it appropriate that the custodian not be required to seek employment. Minn.Stat. § 518.552, subd. 1 (1984).

■ The statutory factors to be utilized include the resources of each party, the duration of the marriage, contributions of each spouse to the marriage, time the recipient needs for education leading to appropriate employment, and the couple's previous standard of living. *See* Minn.Stat. § 518.552, subd. 2 (1984). These factors require courts to balance the supporting spouse's financial needs and capacity against the other spouse's needs and capacity. *Sefkow v. Sefkow*, 372 N.W.2d 37, 48 (Minn.Ct.App.1985) (citation omitted).

■ The trial court found that Shirley, while presently unemployed, possesses the ability to work, but needs additional training to get into the job market. The court further found Shirley's maximum capability of earnings to be $14,000.00 per year. Finding that William earned in excess of $75,000.00 per year, the trial court awarded Shirley $1,000.00 per month for six years.

William disputes the court's award of maintenance, contending that $1,000.00 per

month is too much and six years is too long. William's basic argument is that contrary to the statutory requirements justifying maintenance, Shirley does not lack sufficient property and can adequately support herself. Moreover, William claims that Shirley is well-qualified, and, therefore, does not require a six year rehabilitation period. William also argues that his 1982 and 1983 incomes were unusually high, and consequently to determine his ability to furnish maintenance based on these incomes is erroneous.

Shirley claims that the maintenance award is justified because over the years she primarily served as a homemaker while William was and continues to be the income earner.

We conclude that the record supports the trial court's award of maintenance. During the course of the marriage Shirley was primarily a homemaker, and her only jobs outside the home were non-career type positions. We hold that the trial court's finding that Shirley is in need of maintenance was not clearly erroneous, and that its award of maintenance was not an abuse of discretion.

## VI.

William claims that Shirley's appeal regarding the custody issues is untimely, and, therefore, should be dismissed. Because this was a bifurcated dissolution proceeding, the custody issues were tried in 1983. The judgment and decree was entered December 20, 1983, and William claims Shirley had ninety days from that date to bring her appeal.

Shirley's appeal is timely. In cases involving multiple parties or multiple claims, "any order * * * or decision * * * which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or * * * decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." Minn.R.Civ. Pro. 54.02.

A child custody determination must be based on the best interests of the child. Minn.Stat. § 518.17, subd. 3 (1984). In examining the interests of a child, the court is to examine a variety of statutory factors, *see* Minn.Stat. § 518.17, subd. 1 (1984), and the court's findings shall reflect an examination of these factors. *Heard v. Heard,* 353 N.W.2d 157, 161 (Minn.Ct.App.1984).

When joint custody is contemplated, additional statutory factors are to be examined. *See* Minn.Stat. § 518.17, subd. 2 (1984). These factors center on the ability of the parents to cooperate in making parenting decisions and apply when either joint legal or joint physical custody is sought or contemplated. *See id.*

After addressing the factors in Minn. Stat. § 518.17, subd. 1, the trial court found that both Shirley and William are both fit persons to have custody. Although the court found both Shirley and William to be capable parents, the trial court stated in its memorandum that because of the "extended controversy surrounding this marriage," the parties have "no ability to cooperate in the rearing of their children, nor would either be able to adopt methods for resolving disputes regarding major decisions concerning the children." Accordingly, the trial court determined that joint custody under section 518.17 was unavailable. *See* Minn.Stat. § 518.17, subd. 2 (1984).

The trial court awarded Shirley sole legal and physical custody for three years, from December 20, 1983 until July 15, 1986, and William custody for three years thereafter. The trial court directed the custodial parent to cooperate with the non-custodial parent in making "major decisions concerning the minor children" and authorize the non-custodial parent's access to the children's educational, medical, and other confidential records. In its memorandum, the trial court stated that while its award is not totally in the best interests of the children, it is the best resolution available. The court added that:

The decision should force the parties to cooperate in the children's rearing. Each party, knowing the other has reciprocal rights and obligations, should realize their rights are dependent on cooperation, to put their best foot forward, so to speak. The children should benefit from this forced cooperation.

The court concluded by noting that although the shared or alternating custody provision "lacks in long term stability, it more than compensates by forced cooperation between the parties and obtaining optimum parenting skills from each."

A trial court has broad discretion in custody matters. *Heard*, 353 N.W.2d at 161. Appellate review is limited to "whether the trial court abused its discretion by making findings unsupported by the evidence or by improperly applying the law." *Pikula v. Pikula*, 374 N.W.2d 705, 710 (Minn.1985). Our task is to "review the sufficiency of the evidence in the underlying record to determine the propriety of the trial court's decision * * *." *Id.* The findings of the trial court must be sustained unless clearly erroneous. *Id.*

Shirley claims the custody award is in fact one of joint legal and physical custody on a rotating basis made in disregard of the trial court's finding that the parties lack the ability to cooperate in the rearing of their children. Shirley also argues that the court erred in determining that "[t]he children should benefit from this *forced cooperation* [between their parents]."

William contends Shirley's argument that the evidence fails to support the award of joint legal custody is without merit because the court expressly denied joint custody. William also claims Shirley is precluded from arguing about the sufficiency of the evidence because she failed to supply this court with a trial transcript.

 The trial court's determination amounts to an award of joint custody. *See* Minn.Stat. § 518.003, subd. 3(b) (1984). The trial court's de facto joint legal custody award, made in disregard of its findings that the parties cannot cooperate, is not in the children's best interests. The statute permitting joint legal custody:

> implies that an award of joint legal custody serves children when their separated parents can cooperatively deal with parenting decisions. It also implies that the award is destructive when the facts show a hazard joint legal custody will create occasions for quarreling of the parents and stress for the children. Awards which are inappropriate for the children are not more attractive because they compromise the dispute of the parents.

*Heard v. Heard*, 353 N.W.2d 157, 162 (Minn.Ct.App.1984). The record does not reveal the parties' ability and willingness to cooperate, and the trial court stated that the parties lacked such an ability. Thus, the trial court's findings directly contradict the basis upon which the statute permits an award of joint custody.

Moreover, the trial court reversed the standard for awarding parents joint custody. *See Chapman v. Chapman*, 352 N.W.2d 437, 440–441 (Minn.Ct.App.1984). In *Chapman*, this court determined that the parties were not candidates for joint custody, and stated that:

> [t]he trial court reversed the standard. Instead of granting joint custody because the parties *can* cooperate and amicably settle disputes about the children, the judge granted joint custody because they *cannot*. Although ideally the parents should make major decisions concerning their children jointly, joint legal custody should not be used as a "legal baseball bat" to coerce cooperation, as advocated by the father's attorney.

> The record shows that the parents have basic differences concerning the health care, religious training and general upbringing of their children. They have not been able to communicate or cooperate in resolving their differences. Joint custody would only exacerbate the problem by dividing authority and increasing opportunities for conflict.

*Id.* (emphasis in original). The trial court here attempted to force cooperation between Shirley and William. As in *Chap-*

*man,* the trial court reversed the standard, and made an award of custody contrary to the best interests of the parties' daughters.

Finally, we note that rotations of custody are akin to modifications of an award. *See Heard,* 353 N.W.2d at 162. Generally, it is not in the best interests of children to unnecessarily change custody. *Id.*

For these reasons, we hold that trial court abused its discretion in making a custody award that in substance amounts to joint legal custody when the court specifically found that William and Shirley do not possess the ability to cooperate in the rearing of their children. We refuse to recognize the trial court's attempt to force the parties to cooperate. Accordingly, we reverse the trial court's decision granting William custody commencing July 16, 1986. The record supports, however, the trial court's initial award of custody to Shirley, and thus we conclude that she is entitled to custody of the parties' children.

### VII

 Shirley claims the trial court's mandate that the custodial parent remain in the St. Cloud school district places an undue burden on her freedom to move to another city within the State of Minnesota.

William argues that this claim, too, is untimely and should be dismissed and in the alternative, asserts that the issue is not ripe for adjudication because Shirley has made no showing that she sought and was denied court approval to move.

Shirley's appeal on this issue is timely. *See* Minn.R.Civ.Pro. 54.02. Because the trial court's residential restriction is contrary to law, it is an impermissible limit, and we, therefore, reverse. *See Sefkow v. Sefkow,* 372 N.W.2d 37, 47 (Minn.Ct.App. 1985) (trial court's mandate that custodial parent reside in one of two Minnesota cities held to be unnecessary and unlawful).

### VIII

 Shirley's final argument is that the trial court erred in providing that her maintenance terminates upon her cohabitation with an individual of the opposite sex. According to Shirley, terminating maintenance upon the recipient's death or remarriage is related to economics. Shirley claims she may seek to share an apartment with someone, possibly male or female, and such an arrangement would not necessarily involve a commingling of incomes.

William responds that the trial court intended maintenance to terminate upon the entry into the household of another adult.

We reverse the trial court on this issue for the reason that living with another individual, male or female, does not automatically trigger an economic dependency and certainly does not result in the attachment of legal consequences. Therefore, the trial court's provision for termination is unfair and without basis, and we accordingly reverse the trial court's decision.

### DECISION

The trial court's valuation of the William Bateman Agency is reversed. The trial court's judgment with respect to the William-Michael Properties, the Anderson, Bateman & Dolan Partnership, and the agency furniture is also reversed. The judgment is affirmed on the disposition of the parties' homestead, the award of spousal maintenance. The trial court's award of child custody is reversed. Finally, the judgment is reversed with respect to the residency restriction and termination of spousal maintenance upon Shirley's cohabitation with an individual of the opposite sex.

Affirmed in part, reversed in part, and remanded for findings consistent with this opinion.