In Re the Marriage of Jean NELSON,
Petitioner, Respondent,

v.

Donald W. NELSON, Appellant.

No. C6–86–2123.

Court of Appeals of Minnesota.

Sept. 8, 1987.

Brian L. Sobol, Stephen C. Davis, Minneapolis, for appellant.

Leo Dorfman, Dorfman & Dorfman, Ltd., Minneapolis, for respondent.

Heard, considered and decided by NIERENGARTEN, P.J., and FOLEY and RANDALL, JJ.

## OPINION

FOLEY, Judge.

Donald Nelson appeals from a September 19, 1986 dissolution judgment and from a November 12, 1986 order denying his motion for a new trial, claiming that the trial court erred in valuing an engineering consulting firm, in which he is the sole "fee generating" professional. We affirm in part, reverse in part and remand.

### FACTS

Appellant Donald Nelson and respondent Jean Nelson were married for 32 years at the time of the dissolution trial in June 1986. Appellant is a mechanical engineer. In 1968, he founded a consulting firm, Mechanical Data Corporation.

Respondent has no professional training and was not gainfully employed outside the home during the marriage. She is a traditional homemaker who assisted appellant professionally and socially in the pursuit of a successful career and assumed primary caretaking of the couple's five children, all of whom were emancipated at the time of dissolution.

The trial court's award of temporary maintenance is not contested on appeal. At the time of dissolution, the parties had marital property valued in excess of $1 million.

*Valuation of Mechanical Data Corporation*

Mechanical Data's market consists of large commercial heating and ventilation systems designed by architects and consulting engineers for commercial, industrial and government buildings, primarily in Minnesota, North Dakota and South Dakota. Mechanical Data has been involved with such projects as the University of Minnesota, the Metrodome, St. John's Hospital and IBM in Minneapolis and various Target stores throughout the country. The corporation tests and optimizes designs of the buildings and draws almost 100% of its commissions from these large projects.

Appellant, a highly specialized, licensed and certified test balance engineer, is president and managing officer of Mechanical Data, and he owns 87.6% of the corporation's issued and outstanding stock. The remaining stock is owned by the parties' children.

The majority of Mechanical Data's business is generated through personal relationships appellant has established with various consulting engineers. The corporation has no regular customers. The consulting engineers are hired by architects to design heating and ventilation systems and, as a specification for installation of these systems, require the installing contractor to hire a certified balance and testing engineer such as appellant. Mechanical Data's closest competitor is located in Des Moines, Iowa. This corporation also obtains work locally through personal contacts.

Appellant is certified and guaranteed by the Associated Air Balance Council (AABC). He is the only engineer in Minnesota with this certification and completed rigorous testing to obtain the license. The license is non-transferable. Of the 60 agencies throughout the country performing specialty services similar to Mechanical Data, only 95 engineers are test balance certified.

In addition to appellant, the only certified professional engineer, Mechanical Data

also employs three field technicians and one secretary to gather various data pursuant to appellant's instruction. Although the usual ratio of technicians to engineers in the industry is three to one, appellant is solely responsible for calculation of data, analysis of systems, construction of projects and supervision of repair work. These engineering functions take approximately 90% of his time. The remaining 10% is devoted to management and sales.

Among the major corporate assets is a company-owned airplane acquired for $250,000. For the fiscal year ending August 31, 1985, the airplane had a depreciated book value of $84,000. Larry Johnson, president of Ford Aviation, Inc., testified that the market value of the airplane is approximately $160,000. Appellant's expert, James Bunke, sales manager for Elliot Flying Service, Inc. which sold the airplane to the corporation, testified that a realistic market value for the airplane is approximately $150,000. Bunke acknowledged that appellant had recently listed the airplane for sale at $175,000.

Two certified public accountants testified at trial concerning the market value of Mechanical Data: Gerald Weinberg on behalf of appellant and Barry Rubin on behalf of respondent. Their conclusions, as well as the trial court's, are summarized below:

Weinberg's Valuation (as of April 30, 1986)

| | | |
|---|---|---|
| Net Book Value | | $190,000 |
| Additions: | | |
| Excess fair mkt value | $89,000 | |
| Value of backlog | 32,000 | 121,000 |
| Subtractions: | | |
| Overbillings on jobs in progress | $ 73,000 | |
| Write-off acct/rec from appellant | 62,000 | |
| Reserve for recall wk | 52,000 | |
| Income tax effects of adjustments | (20,000) | |
| | | 167,000 |
| Indicated Value | | $144,000 |

Under this valuation, the fair market value of appellant's 86.7% interest in the corporation would total approximately $126,000.

Weinberg's valuation approach was based on the book value of the business as adjusted to account for key assets and liabilities not reflected in the books of account. His primary upward adjustment to fixed assets was an adjustment for the corporate airplane up to a fair market value of $130,000. The excess of fair market value over book was based on a total fair market value of $173,600 for fixed assets less net book value of $84,578. Weinberg's downward adjustment to book value for recall work was based on an expected 23 hours of recall work for every 100 hours put into a project. This calculation derived from analysis of Mechanical Data's job sheets and used fiscal year 1985 billings of $528,000 as a reference point.

Weinberg did not ascribe an intangible value to the business. His opinion was based on analysis of the technical aspects, personal service character and cyclical nature of the business and interviews with corporate personnel to assess their technical knowledge, background and contributions to new business. Weinberg concluded that if appellant were to die or become seriously disabled, Mechanical Data would immediately cease to operate.

During cross-examination, Weinberg acknowledged that he did not apply Internal Revenue Ruling 59–60, a set of guidelines for valuing shares of stock in closely-held corporations rendering services. He admitted that if appellant died, the IRS would likely value the business as a going concern under Ruling 59–60.

Rubin's Valuation

| | | |
|---|---|---|
| Method 1: Value of Tangible/Intangible Assets | | |
| Stockholder's Equity | $278,315 | |
| Goodwill Value | 0 | |
| Going Concern Value | 98,360 | |
| | | $376,675 |
| D. Nelson's 87.6% ownership | | $329,967 |
| (Rounded) | | $330,000 |
| Method 2: Stream of Income Value | | $436,218 |
| D. Nelson's 87.6% ownership | | $382,127 |
| (Rounded) | | $382,000 |
| Method 3: Cash Flow Capitalization | | $557,977 |
| D. Nelson's 87.6% ownership | | $488,788 |
| (Rounded) | | $489,000 |
| Average of three methods (rounded) | | $400,000 |

Rubin's valuation approach was based on review of Mechanical Data's history, business and operating results over the past five years. Unlike Weinberg, Rubin incorporated Internal Revenue Ruling 59–60 into his valuation.

Method 1 values the underlying assets and adds the corporation's intangible value as a going concern. Method 2 measures the projected discount stream and discounts it to present value. Method 3 utilizes a cashflow capitalization of the corporation's pre-taxed net profit before depreciation and interest expense. This method assumes the business is debt free and would afford prospective purchasers the option to use borrowed money (creditor debt) to acquire the business or to pay cash.

In all three methods, appellant's officer salary "in excess of the industry average" was capitalized as additional profits of the business. Salary paid to appellant which reflected the industry average was not capitalized and was utilized as a deduction in arriving at corporate net income.

Rubin acknowledged that he did not know the average salary of a certified test and balance engineer in the upper Midwest. He explained that he "normalized" appellant's salary from $115,000 to approximately $75,000 based upon a median officer salary in the industry of 11.6% of gross sales. Had he used an upper range base of 19% in calculating a reasonable officer's salary, appellant's 1985 salary of $115,000 would be approximately $8,000 less than the industry average. In such case, adjustments to appellant's actual net income would not have been necessary. Rubin utilized an upward net adjustment for the airplane of $85,920. This was based on a market value of $170,000 and a depreciated book value of $84,080.

*The Trial Court's Findings and Conclusions*

The trial court rejected Weinberg's net value of appellant's interest in the corporation, finding that his approach failed to account for (1) the going concern nature of the business, a "characteristic which imparts significant value" to the corporation and a method which would be used by the IRS if appellant died; and (2) a fair market value of $160,000 for the company-owned airplane. Accordingly, the trial court adjusted the value of the corporation upward by $76,000 ($160,000 market value of airplane less $84,000 depreciated book value) for an adjusted book value of $221,000.[1]

Apparently, the trial court accepted Rubin's three method average approach but found Mechanical Data's total value to be $452,000 rather than the $400,000 averaged total value listed in Rubin's report. This amount was modified, however, based on the trial court's finding that Rubin had failed to apply a discount for key-man and for lack of marketability.

Both discounts are appropriate in this case. [Appellant] is the only certified engineer employed at Mechanical Data Corporation. A vast majority of the work performed by the company is contingent on [appellant's] ability to certify the work performed as a test and balance engineer. The value of the business clearly should be discounted to reflect [appellant's] key-man status.

A discount for lack of marketability is also appropriate in this case. The company is dependent on the skills of a certified air balancing engineer. There are only 95 such engineers in the country. While there are no sales restriction agreements applicable to [appellant's] stock, it nevertheless appears fair and equitable to discount the value of [appellant's] stock to reflect the lack of marketability.

Finding evidentiary support for 30% as a reasonable discount, the trial court applied this discount to $452,000 resulting in a corporation value of $316,400. Appellant's 87.6% interest was thus $277,200.

---

**1.** Appellant acknowledges on appeal that Weinberg did not properly calculate the market value of the airplane and concedes that an upward adjustment is necessary to reflect this fact although he disagrees with the trial court's calculations.

### ISSUES

1. Is capitalization of income a permissible method of valuing appellant's interest in a professional service corporation in which he is the sole "fee generating" professional?

2. Did the valuation method relied upon by the trial court impermissibly capitalize compensation for appellant's personal services?

3. Is the trial court's key man/marketability discount supported by the evidence in this case?

### ANALYSIS

*Standard of Review*

Appellant asserts that the trial court's valuation of his interest in Mechanical Data under the capitalization of income method is erroneous as a matter of law under *Rogers v. Rogers,* 296 N.W.2d 849 (Minn. 1980). Respondent contends that the trial court's valuation of appellant's interest in the corporation must be upheld unless clearly erroneous.

In dissolution cases, the trial court's assignment of specific value to the parties' assets will be upheld unless clearly erroneous. *See* Minn.R.Civ.P. 52.01; *Hertz v. Hertz,* 304 Minn. 144, 145, 229 N.W.2d 42, 44 (1975). Since valuation of an asset is often an approximation, "it is only necessary that the value arrived at lies within a *reasonable range of figures." Id.* at 145, 229 N.W.2d at 44 (emphasis added). *See Johnson v. Johnson,* 277 N.W.2d 208 (Minn.1979); *Campion v. Campion,* 385 N.W.2d 1 (Minn.Ct.App.1986).

Accordingly, a valuation by the trier of fact will be upheld if it *"falls within the limits of credible estimates* made by competent witnesses even if it does not coincide exactly with the estimates of any one of them." *Hertz,* 304 Minn. at 145, 229 N.W.2d at 44 (emphasis added). *See Campion,* 385 N.W.2d at 6.

Appellant initially contends that only the adjusted book value approach to valuation was proper in this case. Alternately, he claims that the capitalization of income approach utilized by the trial court impermissibly capitalized his reasonable compensation in direct contravention of *Rogers.* Finally, he challenges the trial court's key man/marketability discount as too low.

### I.

Essentially, methods of valuing a professional practice can be divided into three groups: (1) adjusted book value; (2) capitalization of income; and (3) buy-sell agreement. Appellant argues that because of his expertise and status as sole "fee generating" professional in the corporation, the trial court was required to value the business as a sole proprietorship and utilize an adjusted book value approach.

While we accept appellant's characterization of his status in the corporation as the sole "fee generating" professional, we decline to hold that this status mandates valuation of the business as a sole proprietorship under the adjusted book value approach.

In *Bateman v. Bateman,* 382 N.W.2d 240 (Minn.Ct.App.1986), *pet. for rev. denied* (Minn. April 24, 1986), we indirectly addressed this issue, finding error in the trial court's valuation of a self-owned insurance agency under the capitalization of income approach. *Bateman,* however, is not supportive of appellant's position since the owner of the agency in that case was also the *only employee.*

> If [appellant's] agency employed other workers and thus [his] income was derived from profits arising from ownership as well as compensation for his personal services, it would not be improper to capitalize earnings from the agency arising from [appellant's] ownership of the agency. See Robinson, 355 N.W.2d [737 (Minn.Ct.App.1984)] at 740. Such is not the case here, however. [Appellant] has *no other employees.* Any valuation based on the capitalization of [his] income is inappropriate and may not be considered.

*Bateman,* 382 N.W.2d at 246 (emphasis added).

Here, Mechanical Data's profitability unquestionably results from appellant's broad based personal contacts and his particular expertise. Nonetheless, he is not the entity's only employee as in *Batemen.*

Appellant asserts, however, that *Bateman* cannot be construed so literally, since it is logical to assume that the owner of the insurance agency at least had clerical assistance. He urges this court to delineate *Bateman* as rejecting a capitalization of income approach when the business employs only one "fee generating" employee, not simply one employee. In its place, he advocates a rule of law providing that the capitalization approach is only appropriate where work generated by *other* employees results in profits derived from ownership of the corporation.

This theory is reasonably attractive but not compelling. Cases relied upon by appellant may indicate a preference for the adjusted book value approach but they do not dictate such a result. *See, e.g., Johnson v. Johnson,* 277 N.W.2d 208 (Minn. 1979) (valuation of interest in a *joint venture* approached in same manner as valuation of withdrawing partner's interest); *Lowe v. Lowe,* 372 N.W.2d 65 (Minn.Ct. App.1985) (valuation of vocational rehabilitation business by the respondent's expert under adjusted book value approach upheld when the appellant's expert valuation under capitalization approach effectively restricted the respondent's future employment); *Novick v. Novick,* 366 N.W.2d 330 (Minn.Ct.App.1985) (valuation of the respondent's stock in privately owned brokerage firm at higher rate upheld when the respondent had controlling interest in the firm and when valuation was not premised on assumption that he would remain in company's employ).

Simply put, the issue posed is one of policy and thus better suited for extensive comment by the supreme court. Suffice it to say that although appellant's theory is attractive, it is not without problems. People incorporate for a number of reasons. Assuredly, one cannot expect to derive tax benefits from incorporation and then claim status as a sole proprietor for purposes of valuation.

In *Rogers,* the court reversed and remanded the trial court's valuation of the appellant's 85% interest in an engineering services corporation when the valuation methods were defective and when the basis for the trial court's findings and conclusions was not sufficiently explained. The first defect was the expert's failure to consider a buy-sell agreement. This defect was not dispositive of the case. The second flaw was inclusion of *all* officers salaries in the corporation's annual net income. "The net income of a corporation * * * should *not* include the salaries of its employees and officers, *except as those salaries reflect a distribution of profits."* *Rogers,* 296 N.W.2d at 852–53 (emphasis added). Furthermore, the expert's inclusion of reasonable compensation for the appellant's services in net income calculations ran contrary to *Roberson v. Roberson,* 296 Minn. 476, 206 N.W.2d 347 (1973), where the court stated:

> "[A]ttaching a value to a business by capitalizing its income ordinarily requires *exclusion of the value of personal services rendered by the owner."*

*Id.* at 477, 206 N.W.2d at 348 (emphasis added).

For similar reasons, a method which utilized the present value of the appellant's earnings over the next 11 years of his working life was declared invalid because it did not exclude a portion of the appellant's annual income representing reasonable compensation:

> If the trial court accepted this valuation, it not only awarded to respondent alimony based upon appellant's future income but also awarded, by way of a property settlement, an additional 40% of the present value of appellant's future income. This would be clearly improper under *Roberson.* Respondent is entitled to property acquired during the mar-

riage, but she is not entitled to a lien on appellant himself. [This] method is therefore unsatisfactory *to the extent that it capitalizes as property appellant's future salary.*

*Rogers,* 296 N.W.2d at 853 (emphasis added).

## II.

Appellant challenges Rubin's determination that $40,000 of his annual salary represented "excess salary" and his capitalization of this amount as part of corporate earnings. He contends that this valuation is wholly arbitrary and impermissibly capitalized compensation for his personal services in direct contravention of *Rogers.* We are not similarly persuaded.

First, Rubin's calculations were based on revenue and salary figures provided by Robert Morris & Associates, a common source of updated business and banking information. According to this source, industry officer salaries (as a percentage of gross annual sales) ranged from a high of 19% to a low of 7.3%. Rubin selected the median percentage figure of 11.7% and normalized appellant's $115,000 yearly salary to $75,000. While we agree with appellant that his specialized training and certification would likely have justified a salary based on the upper quartile figure of 19%, we cannot say that Rubin's valuation lacked a reasonable basis in fact.

Second, it is evident from Rubin's cross-examination that he was aware of the *Rogers* decision and its application to the present case:

Q  Well, you made a statement on response to a question on Direct Examination with respect to capitalization of earnings that you're capitalizing the corporate earnings and not individual earnings?

A  That's right.

Q  Okay. Is there a reason to make a distinction as you understand it?

A  The reason I'm capitalizing the corporate earnings is to determine the value of the corporation *and I am pulling out the personal-service aspect of the business. I'm taking reasonable officer compensation out and determining what this corporation makes.*

Q  And it is your understanding that it's impermissible under the *Rogers* case to capitalize individual earnings?

A  *I didn't capitalize individual earnings.*

\*     \*     \*     \*     \*     \*

Q  And so, I take it then, in common-sense parlance by making some allowance for reasonable compensation you're attempting to segregate personal-service income from residual corporate income?

A  That's correct.

Q  And you do that with a mind of not running afoul of the *Rogers'* teaching?

A  I did this before *Rogers* too. I'm determining corporate earnings.

(Emphasis added.) We conclude that the valuation method utilized by the trial court did not impermissibly capitalize appellant's individual earnings.

## III.

Appellant lastly contends that the trial court's 30% discount for key man/marketability is arbitrarily low. We agree.

In *Rogers,* the court rejected a 25% key-man discount when it did not accurately reflect the appellant's importance to the corporation.

[T]here is no indication that [the 25% discount] bore any relationship to the importance of appellant to the continuing success of [the corporation]. While the testimony did not establish that [the corporation] would be worthless without appellant, it is clear that appellant is a key man—if not *the* key man—in [the corporation], and the profitability of the corporation would be substantially reduced if he were to leave.

*Rogers,* 296 N.W.2d at 853 (emphasis in original).

As in *Rogers*, the trial court's discount in this case simply does not accurately reflect appellant's importance to the corporation. Here, the trial court was presented with evidence that: (a) Mechanical Data would cease operation if appellant left the business; (b) appellant is the sole fee generating professional employed by the corporation; (c) appellant is specially certified as a test balance engineer (one of only 95 in the country and the only one so certified in Minnesota, North and South Dakota); and (d) the corporation derives the majority, if not all, of its business through appellant's personal contacts with mechanical contractors in the area.

This evidence, particularly in the absence of expert testimony establishing 30% as a reasonable key man/marketability discount, compels the conclusion that the trial court's discount was arbitrarily low. We so hold.

### DECISION

The trial court did not err in valuing the corporation under the capitalization of income approach. The trial court's key man/marketability discount is reversed and the matter remanded for findings consisting with this opinion, including the taking of additional testimony, if necessary.

Affirmed in part, reversed in part and remanded.