In re the Marriage of: Francis Stephen **GILL, petitioner, Respondent,**

**v.**

**Gretchen Zwakman GILL, Appellant.**

**A16-1421**

Court of Appeals of Minnesota.

Filed August 14, 2017

Karim El-Ghazzawy, Basil El-Ghazzawy, El-Ghazzawy Law Offices, LLC, Minneapolis, Minnesota; and Michael V. Ciresi, Michael A. Sacchet, Ciresi Conlin LLP, Minneapolis, Minnesota (for respondent).

Alan C. Eidsness, Lisa T. Spencer, Henson & Efron, P.A., Minneapolis, Minnesota (for appellant).

Considered and decided by Jesson, Presiding Judge; Rodenberg, Judge; and Bratvold, Judge.

## OPINION

RODENBERG, Judge

Appellant-wife Gretchen Zwakman Gill appeals the district court's award of "earn-out" payments to respondent-husband Francis Stephen Gill as his nonmarital property. We reverse and remand.

## FACTS

The parties married in 1993. There were four children born of the marriage. Husband is an entrepreneur and, during the marriage, he helped lead Talenti, a successful gelato company. In 2008, husband and a business partner purchased a majority ownership interest in Talenti. Husband set up Wyndmere LLC to hold his interest in Talenti. Twenty percent of his interest in Wyndmere LLC was transferred to trusts created for the parties' children. The remaining 80% of the LLC was held in husband's name. Between 2008 and 2014, Talenti's value grew significantly. During that time, David Goliath Group LLC (DGG) was created. By 2014, DGG was the parent company for Talenti, and Wyndmere LLC held a membership interest in DGG. In 2014, DGG's members sold all of their membership units and DGG's assets—including Talenti—to Unilever N.V. and Conopco Inc. (collectively, "purchaser"). At the time of that sale, husband held an 80% interest in Wyndmere LLC, which in turn owned 38.7043% of DGG. DGG in turn owned 100% of Talenti.

Dissolution-of-marriage proceedings were commenced by husband on August 11, 2014. While that case was proceeding, husband negotiated a sale of DGG and the Talenti brand. Purchaser paid DGG and its members $180 million at closing and agreed to make two earn-out payments over the next two years, in exchange for all of DGG's assets and the DGG members' membership units. The earn-out payments were described in the purchase agreement as payments to be made to DGG members at the end of the first and second "earn-out years" (calendar years 2015 and 2016), according to a formula based on the amount by which yearly sales exceeded an established "floor," times a set multiplier, and minus certain variable costs. In the written purchase agreement, the earn-out payments were described as "additional consideration" for the purchase. Each member of DGG was to receive a portion of these payments equal to each's ownership interest in DGG.

In addition to the purchase agreement, husband also negotiated an employment agreement with the purchaser. Under that employment agreement, husband would continue to work for the purchaser at an annual salary of $362,500 for 2015 and $375,625 for 2016, in addition to other benefits. Members of DGG who did not continue to work for purchaser after the sale would receive earn-out payments according to the same formula as husband.

After husband petitioned for dissolution of the marriage, the district court set the valuation date for marital property as September 5, 2014. That valuation date is unchallenged on appeal. The sale of DGG closed on December 2, 2014. As a member of DGG, Wyndmere LLC received 38.7043% of the $180 million up-front payment, as well as a right to the appropriate percentage of any future earn-out payments. Husband continued to work for purchaser and was paid for that employment as noted. Husband argues, and the district court ruled, that the parties' marital interest in the 80% ownership of Wyndmere LLC as of the valuation date was its proportionate share of the $180 million paid by purchaser at closing. It ruled that the earn-out payments were husband's nonmarital property.[1]

Wife challenges the district court's determination that the earn-out payments from the sale of DGG are husband's nonmarital property. The district court characterized the earn-out payments as nonmarital property because they "represent compensation for the value added to Talenti by husband post-valuation date." Wife's motion for posttrial relief was denied. Wife appealed, and husband filed no notice of related appeal. We therefore confine our review to the district court's characterization of the earn-out payments as husband's nonmarital property.[2]

## ISSUE

Are the earn-out payments from the sale of a marital interest in a company husband's nonmarital property by virtue of his having worked for the purchaser during the earn-out period under a separate employment agreement?

## ANALYSIS

The district court determined that the earn-out payments from the DGG sale are husband's nonmarital property by virtue of his having continued to work for the purchasing company after the valuation date, adding value to Talenti which, in turn, increased the amount of the earn-out payments from the purchaser under the purchase agreement. Specifically, the district court determined that DGG was sold for $180 million, and that the earn-out payments compensate husband for his continued work at DGG, since his work was essential to the company reaching the sales goals necessary for DGG's members to receive the earn-out payments. Wife argues that a plain reading of the purchase agreement shows the earn-out payments to have been part of the purchase price of

---

1. The case was tried in November 2015, with the first earn-out payment to be computed on 2015 year-end information. Accordingly, the record does not reveal whether and in what amounts the earn-out payments were made. Resolution of the legal issue presented on appeal does not depend on the amount. The issue is whether the earn-out payments that were made are marital property or husband's nonmarital property, an issue that can be resolved without proof of the precise amount of the payments.

2. The district court rejected husband's argument that $9.3 million of the earn-out payments were compensation for having signed a noncompete agreement that includes periods of time after dissolution of the marriage. The district court's resolution of this issue is not challenged by husband on appeal.

DGG, reflecting the value of DGG on the valuation date, and are therefore marital property.

■■■ The parties agree that their interest in DGG, held in Wyndmere LLC, is marital property. We consider de novo whether property is marital or nonmarital. *Antone v. Antone*, 645 N.W.2d 96, 100 (Minn. 2002).

Wyndmere LLC owned the parties' share of DGG. Wyndmere LLC was created by husband during the parties' marriage, and is therefore presumptively marital property. Minn. Stat. § 518.003, subd. 3b (2016); *Antone*, 645 N.W.2d at 100-01. Husband has not rebutted, and makes no effort to rebut, the presumption that the parties' 80% interest in Wyndmere LLC (after the transfer of 20% in trust for the children's benefit) is marital property. *See Risk ex rel. Miller v. Stark*, 787 N.W.2d 690, 696 (Minn. App. 2010) ("[A] spouse may defeat the presumption by showing by a preponderance of the evidence that the property acquired is nonmarital." (quotation omitted)), *review denied* (Minn. Nov. 16, 2010). The parties' 80% ownership share of Wyndmere LLC at the valuation date is a marital asset.

Wife argues that the unambiguous language of the purchase agreement shows that the earn-out payments were part of the purchase price of DGG. Husband argues that the negotiations leading up to the written purchase agreement show that the purchaser was not willing to pay "a penny more" than $180 million. Therefore, husband argues, the parties' marital interest in Wyndmere LLC must be computed based on a total value of DGG established at $180 million.

We interpret contracts de novo. *Quade v. Secura Ins.*, 814 N.W.2d 703, 705 (Minn. 2012). "Absent ambiguity, we construe contract terms consistent with their plain, or-dinary, and popular sense, so as to give effect to the intention of the parties as it appears from the entire contract" and read the terms in context with the rest of the contract. *Id.* (quotation omitted).

Husband argues, and we agree, that the value of an asset is what a willing buyer will pay for it. *Anderson v. Benson*, 394 N.W.2d 171, 175 (Minn. App. 1986) ("We can only assume that the purchase price he paid reflected what he considered fair value for the corporation in terms of its assets. and liabilities at the time of the sale."); *see also Hawkins v. Mellis Pirie & Co.*, 127 Minn. 393, 396, 149 N.W. 663, 664 (1914) ("[A]ctual value must be determined at the fair price which a person who desires to buy would be willing to pay . . . ."). Because DGG was sold only a few months after the valuation date, and nothing in the record suggests any significant change in the company's value in that short period of time, the amount that the purchaser agreed to pay for DGG is an accurate reflection of DGG's value as of the valuation date. The remaining question, then, is how much the purchaser agreed to pay.

Husband's argument that the purchaser agreed to a purchase price of $180 million *and no more* is unsupported by the record. The purchase agreement identified both the initial $180 million and the earn-out payments as "consideration" for the purchase of DGG. The purchase-price formula was agreed upon and specified in the purchase agreement. The purchase agreement set the price at *no less than* $180 million, and *no more than* $350 million.

Here, the parties to the sale of DGG agreed on a formula to calculate the purchase price of DGG. The price included an up-front payment of $180 million and future earn-out payments of up to $170 million. The letter of intent accurately sum-

marizes the purchase agreement,[3] stating:

The aggregate maximum purchase price for all of the outstanding membership units will be equal to $350.0 million in cash, payable as follows:

(i) $180.0 million ... will be payable by Buyer to the Sellers at the Closing; and

(ii) On February 29, 2016, an amount equal to 1.75 times the Company's Net Sales for the calendar year 2015 ("2015 Net Sales") in excess of $120.0 million, up to a maximum payment amount of $170.0 million, will be payable by Buyer to the Sellers; and

(iii) On February 28, 2017, an amount equal to 1.75 times the Company's Net Sales for the calendar year 2016 ("2016 Net Sales") in excess of the greater of (A) 2015 Net Sales and (B) $120.0 million, with a payment amount not exceeding the difference between $170.0 million and the amount paid under clause (ii) above, will be payable by Buyer to the Sellers. For the avoidance of doubt, the amounts payable under [sections (ii) and (iii)] are contingent and the aggregate amount payable by Buyer to the Sellers under [sections (ii) and (iii)] will not exceed $170.0 million.

The purchase agreement unambiguously provides that DGG was sold for not less than $180 million, and not more than $350 million, with the ultimate purchase price within those parameters to be determined under a formula applied to Talenti's 2015 and 2016 net sales. While dependent on future performance, the earn-out payments are part of the sale price, reflecting the value of DGG at the valuation date.

The district court concluded that the earn-out payments were compensation for husband's continued work at DGG after the sale of the company and after termination of the marriage. Husband advances this line of reasoning on appeal, arguing that his continued work at DGG was essential to the company meeting the sales goals necessary for the sellers to receive the earn-out payments.

In concluding that the earn-out payments are husband's nonmarital property, the district court relied on cases that concerned the valuation of companies *not being sold. See Rogers v. Rogers*, 296 N.W.2d 849, 852 (Minn. 1980) (valuing the shares of a company at which husband remained the president); *Stageberg v. Stageberg*, 695 N.W.2d 609, 616 (Minn. App. 2005) (valuing contingent fees on an attorney's work in progress on the valuation date), *review denied* (Minn. July 19, 2005). Unlike the courts in *Rogers* and *Stageberg*, the district court here had no occasion to predict the future income of DGG to ascertain its value. As husband concedes, DGG's worth was what a buyer was willing to pay for it. *Anderson*, 394 N.W.2d at 175. The unambiguous language of the purchase agreement provides that the purchaser was willing to bind itself to paying the earn-out payments as a part of the sale price for DGG. Its value at the date of sale was the consideration on which the parties agreed. That consideration included an earn-out formula as part of the purchase price. The district court needed only to apply the terms of the purchase agreement to deter-

---

**3.** The purchase agreement is not ambiguous concerning the purchase price, and our reference to the letter of intent is not to determine the meaning of the unambiguous agreement. The letter of intent is additional support, if any were needed, that purchaser agreed to pay no less than $180 million and up to $350 million based on a formula to which the parties agreed.

mine the value of the marital asset. This case is unlike *Rogers* and *Stageberg*. The value of the company being sold was not a matter of opinion. The value was established by the contract between willing sellers and a willing purchaser.

Husband's continued work at DGG after the sale was undoubtedly beneficial to both the sellers and the purchaser in that it helped the company to reach the sales goals necessary for the sellers to receive earn-out payments. But the earn-out payments are clearly not compensation for husband's continued work at the company. He was separately compensated for that.[4] These earn-out payments were made to all of DGG's unit owners regardless of any continued work for purchaser after the sale. The earn-out payments to Wyndmere LLC were computed the same way for the parties' marital 80% of the LLC as for the 20% held in trust for the parties' children. None of the children worked for purchaser. The purchase agreement contemplated DGG's potential to grow after the purchase, and the value of DGG therefore included the earn-out payments. As such, the earn-out payments are properly included in the parties' marital estate. We reverse the district court's award of Wyndmere LLC's share of the earn-out payments to husband as his nonmarital property, and remand to the district court with instructions to equitably divide the earn-out payments as marital property.

## DECISION

The purchase agreement unambiguously provided that the purchaser of DGG was willing to pay $180 million plus two earn-out payments not to exceed a total of $170 million, over the course of two years, and computed under a formula set forth in the

agreement. The earn-out payments were to be received by all of the sellers regardless of whether a seller continued work for purchaser after the sale. Because the earn-out payments were part of the purchase price for DGG, they reflect DGG's value as of the purchase date. The earn-out payments were payable to Wyndmere LLC, which is part of the marital estate. Therefore, the earn-out payments are marital property and subject to division as such. We reverse the district court's award of the earn-out payments to husband as his nonmarital property, and remand to the district court for further proceedings consistent with this opinion.

**Reversed and remanded.**

---

4. Although not dispositive, both purchaser and sellers treated the earn-out payments as proceeds of a sale for tax purposes. Husband did not treat the earn-out payments as income from employment for tax purposes.