CHUTICH, Justice.
This case considers whether future, contingent earn-out payments are marital or nonmarital property under Minnesota Statutes section 518.003, subdivision 3b (2016). While married to respondent Gretchen Zwakman Gill (Gretchen), appellant Francis Stephen Gill (Stephen) purchased an ownership interest in a company.[1] Stephen later sought a dissolution of marriage. After the district court's valuation date for marital property but before the dissolution, Stephen and the other owners of the company sold the company and their ownership interests in that company. The purchase agreement gave the company and its owners the right to receive (1) an up-front payment of $180 million and (2) two potential future earn-out payments, ranging from $0 to $170 million in value.
The parties dispute whether the earn-out payments are marital or nonmarital property. The district court concluded that the earn-out payments are nonmarital property because they are property acquired by a spouse after the valuation date. See Minn. Stat. § 518.003, subd. 3b. The court of appeals reversed. Because the parties' interest in the company was marital property that was acquired before the valuation date, the consideration for the sale of the company, which occurred before the dissolution and included an amount paid at the time of the sale and a contractual right to receive future amounts, is also marital property. We therefore affirm the court of appeals, including its instructions on remand to the district court to equitably divide any received earn-out payments.
FACTS
Stephen and Gretchen married in 1993. Stephen was the president of a company, and Gretchen worked full-time in advertising. Gretchen became a stay-at-home *299 mother in 1994, after the birth of their first of four children, while Stephen continued his career.
In 2008, Stephen and a business partner purchased, as equal partners, a little over 50-percent ownership interest in Talenti, a company that makes gelato, for about $1.5 million. Stephen also became the Chief Executive Officer of Talenti, overseeing "all aspects" of the company, "from production, human resources, marketing, operations, sales, and finances." The district court found that "[i]t is undisputed that Stephen's leadership in all aspects of Talenti was a major factor in its success."
While married to Gretchen, Stephen created Wyndmere LLC (Wyndmere) to hold his interest in Talenti. Wyndmere then acquired a membership interest in David Goliath Group LLC (David Goliath), Talenti's parent company that its members created in 2013 to hold their membership interests.[2] Stephen transferred 20 percent of his interest in Wyndmere to trusts for the parties' children, keeping the remaining 80 percent in his own name. Gretchen is not a named member of Wyndmere, but the parties agree that she has a marital interest in Stephen's 80-percent ownership interest because he acquired it during their marriage. See Minn. Stat. § 518.003, subd. 3b.
After Talenti reached capacity at its manufacturing facility, David Goliath's members, including Wyndmere, hoped to sell the company. In mid-2013, Unilever N.V. and Conopco Inc. (collectively, Unilever) contacted David Goliath about purchasing the company. Negotiations occurred over the next year. Ultimately, David Goliath and Unilever agreed to "an aggregate maximum purchase price" of $350 million, split between a $180 million upfront payment and two additional contingent payments worth a maximum total of $170 million. A letter of intent memorialized their agreement in July 2014.
While negotiations to sell David Goliath were underway, Stephen and Gretchen separated after 21 years of marriage. After Stephen petitioned for a dissolution of the marriage in August 2014, the district court set September 5, 2014, as the valuation date for marital property. See Minn. Stat. § 518.58, subd. 1 (2016) (providing that "[t]he court shall value marital assets for purposes of division between the parties as of the day of the initially scheduled prehearing settlement conference"). The valuation date is unchallenged on appeal.
On December 2, 2014-that is, after the valuation date, but before the dissolution was final-Stephen and the other members of David Goliath sold all of their membership units and the assets of David Goliath to Unilever. Gretchen was aware of the sale and nothing in the record shows that she opposed the sale.[3] At the time of the sale, Wyndmere owned 38.7043 percent of David Goliath. The sale terms, which were set out in a purchase agreement, were consistent with the terms of the July 2014 letter of intent.[4] In exchange for David Goliath's assets and membership units, Unilever made an upfront payment *300 of $180 million to David Goliath upon closing and gave it and its members a right to receive a proportional share of two future earn-out payments, with the value of those payments based on the annual performance of Talenti.
Specifically, the purchase agreement provided in relevant part:
SECTION 1.01. The Asset Purchase.... (b) As additional consideration for the Assets, the Company shall also be eligible to receive from Asset Buyer (i) an amount equal to the First Earn-out Payment ... and (ii) an amount equal to the Second Earn-out Payment....
SECTION 1.02. The Distribution.... [I]mmediately following the consummation of the Asset Purchase, [David Goliath] shall effect a distribution to the Members of (a) the Asset Purchase Payment and (b) the right to receive (i) an amount equal to the First Earn-out Payment ... and (ii) an amount equal to the Second Earn-out Payment....
SECTION 1.03. The Membership Unit Purchase.... (b) As additional consideration for the Membership Units, the Members shall also be eligible to receive from Unit Buyer (i) an amount equal to the First Earn-out Payment ... and (ii) an amount equal to the Second Earn-out Payment....
The agreement specified that the earn-out payments would be calculated according to a formula that was based on the amount by which annual sales exceeded an established "floor" ($120 million in net sales), multiplied by a set multiplier (1.75), and subtracting certain variable costs. The payments would become "final and binding"[5] after the end of the first and second "earn-out years" (calendar years 2015 and 2016). After becoming "final and binding," Unilever would be required to pay each member, including Wyndmere, its respective share of the earn-out payments. All David Goliath members, regardless of whether they (or their individual members) worked for Unilever after the sale, would receive earn-out payments according to the same formula.
Separate from the purchase agreement, Stephen also negotiated an employment agreement with Unilever. He agreed to work as Talenti's Chief Executive Officer at an annual salary of $362,500 in 2015 and $375,625 in 2016.
The district court dissolved the parties' marriage on January 4, 2016. Gretchen disputed the district court's classification of the earn-out payments as nonmarital property. After a 3-day trial focusing primarily on the valuation and division of marital assets and debts, the district court concluded that the earn-out payments were nonmarital property acquired by a spouse after the valuation date. See Minn. Stat. § 518.003, subd. 3b. Interpreting the purchase agreement, the court explained that the earn-out payments were "consideration" for "an opportunity for Talenti ownership to prove that Talenti could be a different, higher-grossing company in the future." And the court found that the payments "represent[ed] compensation for the value added to Talenti by [Stephen] post-valuation date." If obtained, the court reasoned, the earn-out payments would "be a result of [Stephen's] significant post-marital labor and should be awarded to him as his non-marital property."
Looking to the sale of the parties' marital asset that occurred 3 months after the *301 valuation date, the district court determined that the "full marital value" of Stephen's marital interest in David Goliath was 80 percent of Wyndmere's share of $180 million-the value of the upfront payment that Unilever was willing to pay in the purchase agreement. The court reasoned that the upfront payment compensated for work completed during the marriage, unlike the earn-out payments, which compensated for future work.
Accordingly, the district court concluded that the earn-out payments are nonmarital property and Gretchen has no marital interest in the payments.[6] The court supported its conclusion with findings of fact related to the timing of the sale (after the valuation date); the intent for the earn-out payments to compensate for future, post-marital efforts by Stephen; Stephen's important role in the company; and the amount of work that Stephen would have to do for the company to achieve the earn-out payments after the dissolution.
Gretchen filed a post-trial motion challenging the district court's conclusion that the earn-out payments from the sale of their marital interest in David Goliath were non-martial property. The district court denied Gretchen's motion.
Gretchen appealed, challenging the district court's ruling on the earn-out payments. The court of appeals reversed, concluding that, as a matter of contract interpretation, the earn-out payments are marital property. Gill v. Gill , 900 N.W.2d 717, 722 (Minn. App. 2017). The court reasoned that the purchase agreement unambiguously "identified both the initial $180 million and the earn-out payments as 'consideration' for the purchase of [David Goliath]," setting the sales price at "no less than $180 million, and no more than $350 million." Id. at 720-21. And "[w]hile dependent on future performance, the earnout payments are part of the sale price, reflecting the value of [David Goliath] at the valuation date," rather than "compensation for [Stephen's] continued work at the company." Id. at 721-22. Consequently, the court reversed and remanded the case to the district court "with instructions to equitably divide the earn-out payments as marital property." Id. at 722. Stephen sought review, which we granted.
ANALYSIS
We now consider whether the earn-out payments are marital or nonmarital property under Minnesota Statutes section 518.003, subdivision 3b. "Whether property is marital or nonmarital is a question of law" that we review de novo. Olsen v. Olsen , 562 N.W.2d 797, 800 (Minn. 1997). We also interpret contracts and statutes de novo. Linn v. BCBSM, Inc. , 905 N.W.2d 497, 501 (Minn. 2018). But we defer to the district court's underlying findings of fact and do not set the findings aside unless they are clearly erroneous. Antone v. Antone , 645 N.W.2d 96, 100 (Minn. 2002). We do not overturn a district court's evaluation and division of property unless the court abuses its discretion. Id. at 100. "[I]f we are left with the definite and firm conviction that a mistake has been made, we may find the trial court's decision to be clearly erroneous, notwithstanding the existence of evidence to support such findings."
*302 Olsen , 562 N.W.2d at 800 (citation omitted) (internal quotation marks omitted).
A court must first classify property as "marital property" before valuing and dividing that property between spouses. Minn. Stat. § 518.58, subd. 1 (requiring a court to "make a just and equitable division of the marital property " (emphasis added) ). "Marital property" is:
[P]roperty, real or personal, including vested public or private pension plan benefits or rights, acquired by the parties, or either of them, to a dissolution, ... at any time during the existence of the marriage relation between them ... but prior to the date of valuation under section 518.58, subdivision 1.
Minn. Stat. § 518.003, subd. 3b (emphasis added). "All property acquired by either spouse subsequent to the marriage and before the valuation date is presumed to be marital property regardless of whether title is held individually or by the spouses...." Id.
Each spouse has "a common ownership in marital property that vests not later than the time of the entry of the decree in a proceeding for dissolution." Minn. Stat. § 518.003, subd. 3b. "Vesting" here relates to "when parties have common ownership in assets." Janssen v. Janssen , 331 N.W.2d 752, 755 n.3 (Minn. 1983).
The idea of marital property is "grounded in the principle that marriage is a partnership and that each partner should get out of the marriage a fair share of what was put into it." Baker v. Baker , 753 N.W.2d 644, 650 (Minn. 2008). In Nardini v. Nardini , we explained:
[M]arriage is a joint enterprise whose vitality, success and endurance is dependent upon the conjunction of multiple components, only one of which is financial.... [T]he extent to which each of the parties contributes to the marriage is not measurable only by the amount of money contributed to it during the period of its endurance but, rather, by the whole complex of financial and nonfinancial components contributed.
414 N.W.2d 184, 192 (Minn. 1987) (citation omitted). When a marriage ends, each spouse, "based on the totality of the contributions made to it, has a stake in and right to a share of the marital assets accumulated while it endured." Id. We have therefore interpreted "marital property" expansively, so as not to ignore the presumption that "each spouse contributed to the acquisition of property while they lived together as husband and wife." Janssen , 331 N.W.2d at 756 (noting that we avoid a "technical, strict construction of property" to enable "equitable settlements between parties"); see also Nardini , 414 N.W.2d at 191.
To overcome the "presumption of marital property," a spouse must prove, by the preponderance of the evidence, that the property is "nonmarital property." Baker , 753 N.W.2d at 649-50. "Nonmarital property" is defined under section 518.003, subdivision 3b :
[P]roperty real or personal, acquired by either spouse before, during, or after the existence of their marriage, which
(a) is acquired as a gift, bequest, devise or inheritance made by a third party to one but not to the other spouse;
(b) is acquired before the marriage;
(c) is acquired in exchange for or is the increase in value of property which is described in clauses (a), (b), (d), and (e);
(d) is acquired by a spouse after the valuation date ; or
(e) is excluded by a valid antenuptial contract.
(Emphasis added.) We have interpreted "nonmarital property" narrowly because the Legislature created only "five enumerated *303 exceptions" to the "expansive definition of what constitutes marital property." Janssen , 331 N.W.2d at 755 ; see also Minn. Stat. § 645.19 (2016) ("Exceptions expressed in a law shall be construed to exclude all others.").
Accordingly, whether property is classified as marital depends in large part on timing-when the asset was acquired. If property was acquired during marriage and before the court's valuation date,[7] then that property is presumed to be marital and the court may value and divide that marital property equitably. See Minn. Stat. §§ 518.003, subd. 3b, 518.58, subd. 1.
Stephen claims that because he received the contractual right to the earn-out payments 3 months "after the valuation date," the earn-out payments are nonmarital property. See Minn. Stat. § 518.003, subd. 3b(d). But as we set forth below, the earn-out payments were received in exchange for marital property-Wyndmere's interest in David Goliath. Consequently, the district court must equitably divide any proceeds received from the consensual sale of the parties' marital property after the valuation date but during the dissolution proceeding.
The Legislature has expressed in section 518.58 that the proceeds from a sale of marital property that occurs during dissolution proceedings are marital property subject to the court's equitable division. Under subdivision 3, if "it is necessary to preserve the marital assets of the parties," a court can order the parties to sell a marital asset during the "pendency of a proceeding" and then equitably divide the "funds received from the sale during the pendency of the proceeding." And under subdivision 1a, if one spouse violates the fiduciary duty owed to the other spouse by selling a marital asset without the consent of the other spouse during dissolution proceedings, a court may divide the "entire value of an asset and a fair return on the asset to the party who transferred, encumbered, concealed, or disposed of it." Although these subdivisions are silent about how a district court may treat the proceeds of a sale of marital property when both spouses agree to the sale, the Legislature recognized in this language that any proceeds received from the sale of marital property during a dissolution proceeding are marital property.
Similarly, we recognized in Nardini that a court may equitably divide the proceeds of a sale of marital property that occurs during dissolution proceedings if doing so places both parties in the "optimum position." See 414 N.W.2d at 188 (stating that a "court can order the sale or liquidation of the [marital] asset and make a just and equitable division of the proceeds of sale or liquidation"). A court-ordered sale of a marital asset, we explained, "has the advantage of certainty [in value] and may be necessary for equitable division when an indivisible asset constitutes the bulk of the marital property." Id. We see no reason to treat the proceeds of a consensual sale of marital property differently from the proceeds of a court-ordered sale of marital property. A sale of marital property during *304 dissolution proceedings, regardless of when that sale occurs, results in the proceeds from the sale also being marital property, the value of which is defined by the contract selling that asset.
Here, the district court correctly looked to the purchase agreement from the sale of Wyndmere's interest in David Goliath that occurred 3 months after the valuation date to value Wyndmere. It clearly erred as a matter of law, however, by failing to include the contractual right to the earn-out payments as marital property because the earn-out payments, like the upfront payment, were proceeds from the sale accruing to Wyndmere, a marital asset.
Because Wyndmere received a contractual right to receive the earn-out payments from the pre-dissolution sale of a marital asset that was acquired before the valuation date, we conclude that the earn-out payments, as direct proceeds from the sale, are marital property subject to the court's valuation and equitable division. In 2008, while the parties were married, Stephen purchased an interest in Talenti and created Wyndmere for the purpose of holding that interest. After David Goliath became the parent company of Talenti, Wyndmere became a member of David Goliath (during the marriage), holding Stephen's membership interest in David Goliath. Because Stephen created Wyndmere during the parties' marriage, 80 percent of Wyndmere is presumptively marital property. See Minn. Stat. § 518.003, subd. 3b.
Before the dissolution, Stephen and the other members of David Goliath sold David Goliath and their ownership interests in it, including the parties' marital interest in David Goliath through Wyndmere, to Unilever.[8] The sale converted the parties' marital asset from an indirect membership interest in David Goliath into a contractual right to receive proceeds from the sale of David Goliath. In other words, Wyndmere received the contractual right to the upfront payment and the potential earn-out payments only by selling the parties' marital asset, which was acquired during the marriage and before the valuation date. See Minn. Stat. § 518.003, subd. 3b.
To determine the scope of the contractual rights that Wyndmere received from the sale of the parties' marital asset, we look to the sale's purchase agreement. We interpret contractual language de novo. Valspar Refinish, Inc. v. Gaylord's Inc. , 764 N.W.2d 359, 364 (Minn. 2009). "When the [contractual] language is clear and unambiguous, we enforce the agreement of the parties as expressed in the language of the contract." Dykes v. Sukup Mfg. Co. , 781 N.W.2d 578, 582 (Minn. 2010) (citation omitted). "We have consistently stated that when a contractual provision is clear and unambiguous, courts should not rewrite, modify, or limit its effect by a strained construction." Valspar , 764 N.W.2d at 364-65 (citation omitted).
The unambiguous language of the purchase agreement provides that all of David Goliath's members,[9] including Wyndmere, *305 received, in exchange for their interest, a right to a proportional share of (1) an upfront payment of $180 million, and (2) two (possible) future earn-out payments. All members of David Goliath were entitled to the earn-out payments, regardless whether the member (or in the case of David Goliath's LLC members, a member of the member) continued to work for Talenti. Thus, under the purchase agreement every person with a financial interest in David Goliath shared in the payments. The contract's plain language shows that the earn-out payments are part of the purchase price, not compensation for Stephen's future work.[10] A contrary holding would mean, perversely, that Gretchen would be the only person with an interest in David Goliath who would not share in the earn-out payments.
The purchase agreement identified the earn-out payments as "additional consideration" for both the purchase of David Goliath and each membership interest. See Consideration , Black's Law Dictionary (10th ed. 2014) ("Something (such as an act, a forbearance, or a return promise) bargained for and received by a promisor from a promisee; that which motivates a person to do something" and is "necessary for an agreement to be enforceable"). In exchange for David Goliath's assets and membership units, Unilever provided David Goliath and its members, including Wyndmere, not just the upfront payment, but also a right to receive the earn-out payments.
Wyndmere's right to receive its proportional share of earn-out payments, whatever their exact value, is more than a "mere expectancy" interest; it is an enforceable contract right.[11] See Janssen , 331 N.W.2d at 754 (holding that nonvested, unmatured pension benefits are marital property, even though the receipt and value of such benefits depend on post-marital labor and the benefits were not received until after the dissolution). Concluding otherwise would "ignore the presumption" that "each spouse contributed to the acquisition of property while they lived together as husband and wife." Id. at 756.
Although the value of the earn-out payments, ranging from $0 to $170 million, was not certain and the payments were not received before the dissolution, the right to receive the payments was acquired before dissolution, on the date of closing. See Rohling v. Rohling , 379 N.W.2d 519, 522 (Minn. 1986) (determining that retirement funds were marital because the spouse "acquired the right to receive the funds" during *306 the marriage); Janssen , 331 N.W.2d at 754 ("[T]he interest appellant holds becomes more than a mere expectancy-it becomes a chose in action , a contractual right: a property interest."); Faus v. Faus , 319 N.W.2d 408, 413 (Minn. 1982) ("[T]he right to receive increases in value of the pension units was vested during the period of coverture because it was an already existing term of the pension plan." (emphasis added) ). In other words, although the amount of the earn-out payments, if any, was not then ascertainable, the contractual right to receive the payments was certain.[12]
Stephen attempts to overcome the presumption that Gretchen is entitled to an equitable distribution of the earn-out payments by arguing that the earn-out payments are nonmarital property that he acquired "after the valuation date," Minn. Stat. § 518.003, subd. 3b, as compensation for his post-marital labor. But he fails to prove, by a preponderance of the evidence, that the payments are nonmarital property. Id. Stephen ignores that Wyndmere was marital property acquired before the court's valuation date and the sale of Wyndmere replaced the parties' marital asset with proceeds from the sale that the court could equitably divide between the spouses during the dissolution proceeding.
Here, the district court should have, as part of the judgment and decree, determined the "appropriate percentage" of earn-out payments that would be allocated to Stephen and Gretchen "only if and when [such payments] are paid" to Wyndmere. Janssen , 331 N.W.2d at 756 (citing In re Marriage of Hunt , 78 Ill.App.3d 653, 34 Ill.Dec. 55, 397 N.E.2d 511, 519 (1979) ). The exact value of the earn-out payments would then be determined by the terms of the purchase agreement after the end of each earn-out period.
Stephen also asserts that the earn-out payments, unlike the upfront $180 million payment, are compensation for his work after the dissolution. He relies primarily on our decision in Rogers and subsequent court of appeals decisions to make this argument. See Rogers v. Rogers , 296 N.W.2d 849 (Minn. 1980).
But Rogers is a valuation case, unrelated to classifying property as marital or nonmarital property. See id. at 852. The question in Rogers was related to the court's valuation of an ongoing closely-held marital business, which required estimation. See id. The husband in Rogers owned 85 percent of a business that was essentially a one-person operation, and he continued to own and operate the business after the marital dissolution. Id. at 851. In Rogers , we rejected the district court's estimated business valuation because the valuation method that it adopted did not exclude "the value of personal services rendered by the owner." Id. at 853 (citation omitted) (internal quotation marks omitted). Here, unlike in Rogers , a purchase agreement defines the value of proceeds from the sale of marital property, and the court does not *307 need to estimate the value of that marital property. Moreover, the value of the future payments here does not depend on the compensation paid for an individual's personal services but instead reflects the achievements of the company as a whole.
To be sure, the district court's factual findings suggest that Stephen's post-dissolution efforts affected whether the future payments would be made and the amount of the payments. But as we discussed above, the issue here is whether the right to those payments was received during the marriage, see Minn. Stat. § 518.003, subd. 3b ; and it was. That the size of those payments might be influenced by Stephen's post-dissolution efforts does not convert the right to receive those payments into nonmarital property.
To the extent that the district court may consider one spouse's efforts and control over a marital asset, it considers these facts when equitably dividing the marital assets, not when classifying particular property as marital or nonmarital. See Minn. Stat. § 518.58, subd. 1 (requiring a court to consider each spouse's role "in the acquisition, preservation, depreciation or appreciation in the amount or value of the marital property, as well as the contribution of a spouse as a homemaker" when dividing marital property).
Even when considering a spouse's efforts, the court cannot consider those efforts in isolation. It must base its equitable division "on all relevant factors."[13] Minn. Stat. § 518.58, subd. 1. Here, a relevant factor that must be considered is that Gretchen has a marital interest in Wyndmere's contractual right to receive the earn-out payments-a right received by all members that sold their ownership interest in David Goliath regardless of whether they or their members contributed post-sale efforts to achieve the earn-out payments.
Stephen maintains that we must defer to the district court's finding that the earn-out payments are "additional consideration" for Stephen's future labor. We disagree. We need not defer to the district court's purported findings of fact because they are instead conclusions of law based on the district court's interpretation of the purchase agreement.[14] See Graphic Arts Educ. Found. v. State , 240 Minn. 143, 59 N.W.2d 841, 844 (1953) ("[T]he labeling of a conclusion of law as a 'finding of fact' is not determinative of its true nature, and it need not be considered a finding by the appellate court."). We interpret contracts de novo and do not defer to the district court's interpretation of the contract. Because we conclude that the purchase agreement plainly exchanged the parties' marital interest in David Goliath for not *308 just the upfront payment but also a contractual right to receive any achieved earnout payments, we hold, as a matter of law, that the earn-out payments are marital property.
CONCLUSION
For the foregoing reasons, we affirm the decision of the court of appeals. On remand, the district court must (1) value any earn-out payments received by Wyndmere and (2) equitably divide any earn-out payments received.
Affirmed.
Dissenting, Anderson, J., Gildea, C.J.
THISSEN, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.
DISSENT

Because the parties have the same last name, we use, for clarity, each party's first name, as provided in the record.

David Goliath also had four other members, who together owned over 61 percent of the company: Fialko LLC (38.7043 percent), Hochshuler, LLC (18.2914 percent), Majody Helms, LLC (3.3 percent), and Kent Pilakowski (1 percent).

The district court found that "[Gretchen] credibly testified that [Stephen] told her that 100% of Talenti was being sold the following Monday" and that "[t]he sale of Talenti was completed the following Monday...."

The only difference between the letter of intent and the purchase agreement was that the purchase agreement allocated earn-out payments between assets and membership units.

An earn-out payment only became "final and binding" after the parties agreed to, or established through arbitration, the calculated total of each achieved earn-out payment. The purchase agreement included a timeline and process for calculating the earn-out payments and challenging the calculated earn-out payments.

"The case was tried in November 2015, with the first earn-out payment to be computed on 2015 year-end information. Accordingly, the record does not reveal whether and in what amounts the earn-out payments were made. Resolution of the legal issue presented on appeal does not depend on the amount." Gill v. Gill , 900 N.W.2d 717, 719 n.1 (Minn. App. 2017).

The valuation date serves two purposes: it establishes (1) whether property is marital or nonmarital (and subject to the court's equitable division or not), and (2) the date that a court estimates the value of marital assets. Accord Brett R. Turner, Determining the Date for Valuing Marital Property in Divorce Actions , 13 Divorce Litig. 17 (Feb. 2001) ("It is important ... to distinguish clearly between the date of valuation of marital property and the date upon which the parties' active efforts cease to create divisible property. The latter date, known generally as the date of classification, is influenced by completely different policy considerations."). The dissent incorrectly focuses on valuation rather than classification.

The district court's findings show that the sale was fair and reasonable. The sale was between a willing buyer and seller; both parties were aware of the sale and did not contest it; the timing of the sale was to maximize the company's value, not to disadvantage a spouse in a dissolution proceeding; and the negotiated sale price at the valuation date was the same, if not close to, the actual sale price. Accordingly, our analysis is premised on a sale of a marital asset that replaces a marital asset with a sale price that reflects a "fair and reasonable value" for "that marital asset." See Nardini , 414 N.W.2d at 189 (requiring a court's valuation to reflect a "fair and reasonable value" for the company).

Members received the right to future earn-out payments, not individuals . Stephen only acquired the earn-out payments through Wyndmere, which is marital property. Stephen received separate consideration and compensation for his post-sale, and post-dissolution, work in his employment agreement with Unilever.

The contract's plain language is consistent with the parties' representation of the sale during sale negotiations and on tax returns. Summarizing an agreement reached after months of negotiations, a July 2014 letter of intent stated that David Goliath and its members agreed to sell David Goliath and their membership units for $350 million, made in three payments. Additionally, on tax returns filed under the penalty of perjury, the buyers and sellers described the sale as an "installment sale," with a "Maximum Selling Price Unit & Asset Sale" of $350 million. Stephen and Gretchen also reported a "capital gain" for an installment sale on their 2014 joint tax return. This evidence supports the conclusion that the earn-out payments were part of the full purchase price of between $180 million and $350 million.

Contrary to the dissent's characterization of our analysis, after interpreting the entire purchase agreement as a whole, we conclude that Wyndmere received an enforceable contract right to the earn-out payments. Notably, at oral argument, Stephen agreed that Wyndmere, and the other members selling their ownership interests, had an enforceable contractual right to receive earn-out payments.

Although Wyndmere's contractual right to receive the earn-out payments resulted from the sale of the parties' marital asset after the court's valuation date, that contract right (to receive the proceeds of the sale) replaced the parties' marital asset during the dissolution proceedings. Accordingly, the dissent's assertion that we are "reviving a decades-old statutory scheme" is incorrect; we are merely applying the existing statutes to ensure the equitable division of one of the parties' largest marital assets and applying the contract value resulting from the sale of that asset. See Janssen , 331 N.W.2d at 756 (interpreting "marital property" expansively, as not to ignore the presumption that "each spouse contributed to the acquisition of property while they lived together as husband and wife"); see also id. at 755 n.2 (avoiding a "technical, strict construction of property" to enable "equitable settlements between parties").

These factors include "the length of the marriage, any prior marriage of a party, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, needs, opportunity for future acquisition of capital assets, and income of each party." Minn. Stat. § 518.58, subd. 1. The district court must also "conclusively presume" that each party "made a substantial contribution to the acquisition of income and property while they were living together as husband and wife." Id.

To the extent that Stephen and the dissent rely upon findings of fact other than the district court's interpretation of the purchase agreement, those factual findings are not relevant to classifying the earn-out payments as marital or nonmarital property. In particular, the district court's findings of fact related to Stephen's efforts to achieve the earn-out payments are not relevant to the classification of those payments as marital or nonmarital. Instead, the relevant findings of fact relate to timing-when Stephen acquired Wyndmere, when Wyndmere and the other members of David Goliath sold it to Unilever, and when the marriage was dissolved. We defer to those findings.