*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

VAN DYKE SPINAL REHABILITATION
CENTER, PLLC,

        Plaintiff-Appellee,

v

USA UNDERWRITERS,

        Defendant-Appellant.

FOR PUBLICATION
May 30, 2024
9:00 a.m.

No. 365848
Macomb Circuit Court
LC No. 22-002562-NF

Before: FEENEY, P.J., and M.J. KELLY and RICK, JJ.

FEENEY, P.J.

The essential facts in this appeal are both brief and uncontested. On February 22, 2021, Pamela Orr completed an application for no-fault insurance upon which she made a material misrepresentation. Specifically, she answered "no" to the question whether her driver's license had been suspended within the last 3 years. In actuality, her license had been suspended twice and was, in fact, suspended at the time she made the application. The application was submitted to defendant who issued an automobile no-fault insurance policy.

Approximately five months later, on July 18, 2021, Orr was involved in an automobile accident. She sought treatment from plaintiff, who performed medical services for plaintiff over the course of the next several months. It is undisputed that on August 21, 2021, defendant issued a renewal policy apparently after Orr repeated the misrepresentation. Defendant, during the course of investigating the claim, discovered the misrepresentation, and, on December 17, 2021, notified Orr that it was declaring the policy void ab initio and sent Orr a refund check for the entire amount of the premium paid, which Orr cashed.

Consistent with rescinding the policy, defendant denied the claims that plaintiff submitted. Plaintiff instituted this action seeking payment of the claims. Defendant filed a motion for

summary disposition based upon the rescission of the policy, arguing both a failure to state a claim[1] and no genuine issue of material fact.[2] The trial court denied the motion in a detailed opinion and order dated April 4, 2023. The trial court rejected out of hand the motion under (C)(8), noting that the motion relied upon evidence outside the complaint and, therefore, it was inappropriate to consider (C)(8). The trial court explicitly stated that it would only analyze the motion under (C)(10).[3] The trial court granted summary disposition based upon defendant's delay in rescinding the policy and, after a balancing of the equities, concluded that defendant was not entitled to rescission. Defendant then filed an application for leave to appeal to this Court, which we granted.[4]

The applicable standard of review was summarized in *Univ of Mich Regents v Mich Automobile Ins Placement Facility*:[5]

> This Court reviews de novo a trial court's decision on a motion for summary disposition. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). A motion under MCR 2.116(C)(10) tests the factual sufficiency of a claim. *Id*. at 160. When considering a motion under MCR 2.116(C)(10), the trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion. *Id*. "A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact." *Id*. (citation omitted). "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Id*. (quotation marks and citation omitted).

Defendant presents this case as having three different issues: that the trial court erred in determining that defendant waived rescission due to delay,[6] that a balancing of the equities was unnecessary because this case involved mutual rescission, and that even when the equities are balanced, rescission should be allowed. But in reality, all three issues are interrelated. And, to a

---

[1] MCR 2.116(C)(8).

[2] MCR 2.116(C)(10).

[3] Although both parties in their briefs cite the standard of review for both (C)(8) and (C)(10), given that the trial court only addressed the (C)(10) motion and defendant does not seem to explicitly argue why it was entitled to summary disposition under (C)(8), and its arguments on appeal are heaving fact-laden, we will limit the analysis in the same manner as the trial court: only address whether there is a genuine issue of material fact.

[4] *Van Dyke Spinal Rehabilitation Center, PLLC, v USA Underwriters*, unpublished order of the Court of Appeals (Docket No. 365848, issued September 29, 2023).

[5] 340 Mich App 196, 200-201; 986 NW2d 152 (2022):

[6] The trial court analyzed the waiver due to delay issue separately from the balancing of the equities issue, concluding that both independently support denial of rescission. But we believe that the waiver issue is best considered as part of the balancing of the equities and it will be analyzed in that context.

significant extent, they build on defendant's assertion that plaintiff's claims are derivative of Orr's claims under the insurance policy. In support of this assertion, defendant cites the unpublished opinion of this Court in *Wolverine Mut Ins co v Van Dyken*[7] and the published opinion of *Chiropractors Rehab Group, PC v State Farm Mut Auto Ins Co*.[8] This is all in an effort to support its argument that the trial court was not obligated to balance the equities in granting rescission as required by the Supreme Court's decision in *Bazzi v Sentinel Ins Co*.[9]

But *Van Kyken* is not binding precedent[10] and the vacated opinion in *Chiropractors Rehabilitation Group*[11] did state "that a healthcare provider's ability to recover an injured party's medical expenses under the no-fault act is dependent on the injured party's eligibility for no-fault benefits." But the reason that the opinion was vacated, although technically on other grounds, is not inconsequential.

The Supreme Court[12] vacated and remanded for reconsideration in light of its decision in *Covenant Medical Center, Inc v State Farm Mutual Auto Ins Co*.[13] *Covenant*, of course, is the case that held that a provider has no right to bring an action against the no-fault carrier for the payment of benefits,[14] although those benefits may be assigned by the insurer, allowing for an action by the provider under the assignment.[15] The Legislature thereafter amended the no-fault act to explicitly allow providers to bring direct actions against the insurer for the payment of no-fault benefits to the medical provider for services they rendered to the insured.[16]

In *Spine Specialists of Michigan, PC v Falls Lake National Ins Co*,[17] this Court analyzed the statutory amendment and its effect on actions by medical providers when the insured's fraud leads to rescission of no-fault insurance policies:[18]

---

[7] Unpublished opinion per curiam of the Court of Appeals, issued June 8, 2023 (Docket No. 359339).

[8] 313 Mich App 113, 130; 881 NW2d 120 (2015), vacated on other grounds 501 Mich 875; 902 NW2d 414 (2017).

[9] 502 Mich 390; 919 NW2d 20 (2018).

[10] MCR 7.215(C)(1).

[11] 313 Mich App at 130.

[12] 501 Mich at 875.

[13] 500 Mich 191; 895 NW2d 490 (2017).

[14] 500 Mich at 217-218.

[15] 500 Mich at 217 n 40.

[16] MCL 500.3112.

[17] ___ Mich App ___; ___ NW3d ___ (No. 364103, issued 3/28/2024).

[18] *Falls Lake*, slip op at 4-5.

The more fundamental issue presented in this appeal concerns the effect of rescission upon the claims of health-care providers. The trial court awarded Falls Lake summary disposition under MCR 2.116(C)(10) on all the claims of the health-care providers because "[t]hey have a derivative claim of the plaintiff" and "[t]he plaintiff's claim failed because of this material misrepresentation, and as a result their claim[s] fail as well." Although Michigan law at one time permitted providers to pursue relief from automobile insurers exclusively through the assignment of claims, *Covenant Med Ctr, Inc v State Farm Mut Auto Ins Co*, 500 Mich 191, 196, 217 n 40; 895 NW2d 490 (2018), and thereby rendered providers' claims derivative in the sense contemplated by the trial court, our Legislature subsequently altered that framework by amending the no-fault act, MCL 500.3112, to enable providers to pursue claims in their own right. That statutory amendment renders inoperative the trial court's characterization of Spine Specialists' claim as "derivative" in this case.

In 2019, "the Legislature significantly overhauled the no-fault act." *Andary v USAA Cas Ins Co,* 512 Mich 207, 214; 1 NW3d 186 (2023). As a part of that major revision, the Legislature amended MCL 500.3112 to afford health-care providers a direct cause of action, as opposed to the right to proceed only on the basis of an assignment. Specifically, MCL 500.3112 now dictates that "[a] health care provider . . . may make a claim and assert a direct cause of action against an insurer . . . to recover overdue benefits payable for charges for products, services, or accommodations provided to an injured person." Thus, a health-care provider no longer must stand in the shoes of an injured person to pursue a no-fault claim against an insurer. Consequently, the trial court erred in characterizing Spine Specialists's claim as "derivative," and therefore necessarily foreclosed by rescission of the insurance policy that Falls Lake issued to Mota-Peguero.

This culminated in the Court's conclusion that "faced with a direct claim by a provider . . . the trial court had the obligation to balance the equities of rescission and therefore erred when it automatically dismissed Spine Specialists's claim based on Mota-Peguero's material misrepresentation."[19]

The *Falls Lake* holding disposes of defendant's argument that the trial court erred by engaging in a balancing of the equities because plaintiff's claim is based upon Orr's claim and plaintiff is not an innocent third-party. This case involves a direct action by a medical provider (plaintiff) against the insurer (defendant). Plaintiff's complaint in this case makes no reference to proceeding under an assignment by Orr nor is an assignment attached as an exhibit to the

---

[19] *Falls Lake*, slip op at 6. This opinion also dispenses with another of defendant's arguments, namely that a balancing of the equities does not apply in this case because the equities are only balanced between the fraudulent insured and a provider's patient. But in *Falls Lake*, like in this case, the patient and the fraudfeasor were the same person. *Slip op* at 2.

complaint. Clearly, this is a direct action and, therefore, the decision in *Falls Lake* controls.[20] Accordingly, not only was it permissible for the trial court in this case to engage in a balancing of the equities, it was required.

Defendant takes another approach to avoid a balancing of the equities, namely by arguing that this case presents a question of contractual rescission. Defendant asserts that Orr created a mutual agreement to rescind the policy by accepting and cashing the check refunding her premium. This argument is illusory. What defendant overlooks in its argument is that defendant had already rescinded the policy. In a letter dated December 17, 2021, from defendant to Orr, it states that, due to the misrepresentations in the application, defendant was "rescinding and voiding the policy as of the inception date." It then states that a "refund check for all premium you have paid on the policy since the inception date is enclosed." Thus, by the time Orr received and negotiated the check, the policy had already been rescinded. Orr's cashing of the check cannot be seen as an agreement to the rescission. That is, had Orr simply torn up the check instead of cashing it, the policy would still have been rescinded. There is simply no offer and acceptance in this case to establish a contractual agreement to rescind the policy. In other words, contrary to defendant's description, there was no mutual agreement between defendant and Orr to rescind the insurance policy; rather, defendant unilaterally rescinded the policy and Orr merely accepted the refund of the unearned premium.

But even in this Court accepts the premise that Orr's acceptance of the premium refund constitutes a ratification of the rescission, it is of no assistance to defendant. A similar situation was before this Court in *Michigan Regents*.[21] Interestingly, defendant refers to the *Michigan Regents* case three times in its brief, citing it for the proposition that courts recognize a distinction between judicial ratification of an equitable rescission and rescission by mutual agreement of the parties through return and acceptance of the premium. It is technically true that this Court did discuss the distinction between rescission as an equitable remedy and as a legal remedy.[22] But defendant overlooks the fact that this Court concludes that it ultimately does not matter.

After reviewing the Supreme Court's discussion of the distinctions between rescission as an equitable remedy and as a legal remedy in *Meemic Ins Co v Fortson*,[23] the *Michigan Regents* case states:[24]

> Notwithstanding the distinctions between the equitable remedy of rescission and the legal remedy of rescission, this Court has held on multiple occasions that

---

[20] It might be the case that the distinction between a provider proceeding on an assignment and a provider bringing a direct action is one without a difference. But because there is no indication that this case is anything other than a third-party provider proceeding by direct action, we not need to make that determination at this time.

[21] 340 Mich App at 206.

[22] *Michigan Regents*, 340 Mich App at 204-205.

[23] 506 Mich 287, 310 n 19; 954 NW2d 115 (2020).

[24] *Michigan Regents*, 340 Mich at 204-206.

trial courts are required to balance the equities between a defrauded insurer and an innocent third party before extending the mutual rescission of a no-fault insurance policy to an innocent third party. *Estate of Audisho v Everest Nat'l Ins. Co*, unpublished per curiam opinion of the Court of Appeals, issued June 24, 2021 (Docket No. 352391), p. 5; *Alshabi v Doe*, unpublished per curiam opinion of the Court of Appeals, issued January 23, 2020 (Docket No. 346700). While in another case, *Green v Meemic Ins Co*, unpublished per curiam opinion of the Court of Appeals, issued August 20, 2020 (Docket No. 348651), this Court reached the opposite conclusion, the *Green* panel made no reference to our Supreme Court's opinion in *Bazzi*, 502 Mich 390; 919 NW2d 20, and did not address the injured party's status as an innocent third party. In light of these omissions and this Court's opinions in *Alshabi* and *Estate of Audisho*, we hold that trial courts are required to balance the equities between a defrauded insurer and an innocent third party before extending the mutual rescission of a no-fault insurance policy to an innocent third party. This conclusion is consistent with our Supreme Court's recognition that courts of law have "considerable discretion, almost akin to that wielded by equity courts," when granting rescission. *Meemic Ins Co*, 506 Mich at 311 n 19; 954 NW2d 115. Furthermore, application of the *Bazzi* rule to matters involving rescission at law is a logical outgrowth of *Bazzi*.

Our Supreme Court has recognized both that "[r]escission, whether legal or equitable, is governed by equitable principles," *Kundel v Portz*, 301 Mich 195, 210; 3 NW2d 61 (1942), and that courts at law have considerable discretion in granting rescission, *Meemic Ins Co*, 506 Mich at 311 n 19; 954 NW2d 115. Thus, like equitable rescission, rescission as a legal remedy is also not a matter of right, but rather is granted in the sound exercise of a trial judge's discretion. Because the legal underpinnings of equitable rescission and rescission at law are the same, logic dictates that the same rule apply in matters involving rescission at law.

In sum, trial courts are required to balance the equities between a defrauded insurer and an innocent third party before extending the mutual rescission of a no-fault insurance policy to an innocent third party. Thus, the trial court erred when it held that Falls Lake had rescinded Pierson's policy of insurance without balancing the equities between Falls Lake, as a defrauded insurer, and Trevino, as an innocent third party.

In light of *Michigan Regents*, it is clear that, regardless of the basis for seeking the remedy of rescission, the trial court was obligated to balance the equities in determining whether defendant was entitled to rescission. Accordingly, the analysis must now turn to the trial court's balancing of the equities. For guidance, this Court in *Pioneer State Mut Ins Co*,[25] adopted the five factors outlined in *Farm Bureau Gen Ins Co v Ace American Ins Co*:[26]

---

[25] 331 Mich App 396, 411; 952 NW2d 586 (2020).

[26] 503 Mich 903, 906-907; 919 NW2d 314 (2018) (MARKMAN, C.J., concurring).

(1) the extent to which the insurer could have uncovered the subject matter of the fraud before the innocent third party was injured; (2) the relationship between the fraudulent insured and the innocent third party to determine if the third party had some knowledge of the fraud; (3) the nature of the innocent third party's conduct, whether reckless or negligent, in the injury-causing event; (4) the availability of an alternate avenue for recovery if the insurance policy is not enforced; and (5) a determination of whether policy enforcement only serves to relieve the fraudulent insured of what would otherwise be the fraudulent insured's personal liability to the innocent third party. [*Pioneer State Mut Ins Co*, 331 Mich App at 411.]

The trial court also relied on these factors in its analysis.[27] The trial court found that the first three factors weigh in favor of plaintiff, while the last two factors weigh in favor of defendant. It ultimately resolved the weighing in plaintiff's favor. In its reply brief, defendant argues that the first four factors cannot be applied to medical providers, either being inapplicable or neutral, while the fifth factor will always weigh in favor the insurer.[28] We disagree.

With respect to the first factor, defendant argues that it could not have discovered the fraud before the third-party (plaintiff) was injured because plaintiff was not injured. But defendant's argument is inapposite for at least two reasons. As noted above, *Falls Lake* reflects that some modification must be made to the five-factor test when dealing with a medical provider rather than the injured person. The trial court made an adjustment accordingly, weighing the factor in favor of plaintiff. The trial court noted that defendant waited nearly five months after the fraud was discovered before giving notice that it was rescinding the policy, by which time plaintiff had provided over $27,000 in medical care to Orr. The court also noted that during this time plaintiff had no reason to question the validity of the policy. Thus, the trial court essentially viewed the "injury" as being the medical services provided and for which the provider may not be compensated.

Our only concern with the trial court's analysis is that it measured the injury from the time that the misrepresentation was discovered (which, apparently, was at the beginning of plaintiff's providing of services). It would have been appropriate to measure the time not from when defendant actually discovered the fraud, but from when the original insurance application was submitted to defendant (or shortly thereafter). Defendant could have discovered the fraud months in advance of the accident and rescinded the policy at that time instead of waiting until a claim

---

[27] This Court in *Falls Lake* did suggest that the five factors may be ill-suited in resolving a dispute between an insurer and a health-care provider. But it nevertheless thought it useful in guiding the trial court in making its determination. *Slip op* at 6.

[28] Actually, defendant's brief is somewhat confusing on this point. The brief clearly states that at "least four of these five factors require considerations that cannot be applied to medical providers in no-fault actions." But then in the very next sentence, defendant states that "many of the factors will almost always be either neutral or inapplicable" except for the fourth factor and the fifth factor. This would reduce he count to three, not four.

was actually made before pulling Orr's driving record to determine if she was insurable. Defendant's delay created a beneficial scheme for defendant: accept a premium, ask no questions about insurability (at least no questions whose answer would give rise to a ground for recession), and wait to see if a claim arises. If no claim arises, defendant can simply retain the premium. If a claim arises, defendant simply rescinds the policy and refunds the premium. It provides a method to collect a premium while potentially preserving a potential escape from ever having to actually pay a claim.[29]

A second reason to weigh this factor in favor of plaintiff that the trial court did not discuss is that defendant is reading too literally the innocent third party being "injured." Defendant would have the Court only look to who was physically injured in the accident itself. And, true enough, plaintiff was not physically injured. But plaintiff did suffer a financial injury: it provided medical services for which it may never be compensated. Had defendant uncovered the fraud and rescinded the policy before any services were provided, which clearly defendant could have done, then plaintiff would not have suffered this injury.[30]

Furthermore, this factor also incorporates the trial court's separate analysis that defendant waived its right of rescission through delay in acting. As the trial court noted in its opinion, the right to rescind a contract can be waived by inexcusable delay.[31]

Defendant first attempts to dismiss this point by laying responsibility upon the third-party administrator defendant retained to process claims. Defendant notes that while the third-party administrator learned of the misrepresentation when it printed Orr's motor vehicle report on July 22, 2021, defendant itself did not learn of the misrepresentation at that time. But this argument overlooks a basic principle of agency law that knowledge of an agent is imputed as knowledge by the principal. As our Supreme Court stated in *Upjohn Co v New Hampshire Ins Co*:[32]

---

[29] And, to make matters worse, depending on the exact circumstances of the potential insured, it would preclude an insured who could have sought a policy from a carrier that specializes in high-risk drivers, or through the Michigan Automobile Insurance Placement Facility (MAIPF), had the insured been denied coverage in the first place.

[30] Or, at a minimum, would have provided the services knowing that it would only be compensated if Orr, rather than defendant, would be paying the bill.

[31] *La Force v Caspian Realty Co*, 242 Mich 646, 648; 219 NW 668 (1928) ("A right to rescind may of course, be waived by acts showing an affirmance of the contract or by inexcusable delay, but neither waiver or laches arise out of consistent insistence upon rights during pendency of efforts toward an amicable adjustment."). See also *Mestler v Jeffries*, 145 Mich 598, 603; 108 NW 994 (1906) ("a party intending to rescind a contract because of fraud, must be prompt in communicating the fraud when discovered, and consistent in his notice to the opposite party, of the use he intends to make of it.").

[32] 438 Mich 197, 214; 476 NW2d 392 (1991) (quotation marks and citations omitted).

When a person representing a corporation is doing a thing which is in connection with and pertinent to that part of the corporation business which he is employed, or authorized or selected to do, then that which is learned or done by that person pursuant thereto is in the knowledge of the corporation. The knowledge possessed by a corporation about a particular thing is the sum total of all the knowledge which its officers and agents, who are authorized and charged with the doing of the particular thing acquire, while acting under and within the scope of their authority.

In short, defendant chose the third-party administrator to act on its behalf in processing claims. The third-party administrator's knowledge gained in the course of handling those claims is imputed to defendant and it is no defense to defendant that the third-party administrator failed to pass along to defendant any information it discovered in the course of processing the claims.[33]

Defendant also attempts to dismiss the decisions in *La Force* and *Mestler* as being old and involving real estate transactions rather than no-fault insurance cases. This ignores the underlying principle in these cases (and others relied upon by the trial court and plaintiff) that the basic rule is that rescission must be claimed promptly. The discussion of the facts in those cases focuses on whether there were circumstances that would mitigate against disallowing rescission due to unreasonable delay. Defendant points to no Supreme Court decision that has overruled this basic principle. Nor does defendant point to any facts in this case that would excuse the delay.[34] Orr's misrepresentation was discoverable at the time that she submitted the insurance application by the same means that the third-party claims administrator discovered it five months later—by obtaining Orr's driving record report.[35] Nor is there any justifiable reason offered why defendant did not rescind the policy when the misrepresentation was eventually discovered by the third-party claims administrator.

---

[33] Indeed, by defendant's own admission, it issued a renewal of the policy, with Orr repeating the same misrepresentations, one month *after* the third-party administrator learned of the misrepresentations in the initial application.

[34] This point furthers supports the concept that the delay in discovering the misrepresentation and the actual rescission of the policy is an issue best considered as part of the balancing of the equities rather than simply as a stand-alone issue.

[35] It should be acknowledged that our Supreme Court in *Titan Ins Co v Hyten*, 491 Mich 547, 573; 817 NW2d 562 (2012), did overrule the "easily ascertainable" rule, holding that an insurer may seek rescission based upon fraud in the application "notwithstanding that the fraud may have been easily ascertainable and the claimant is a third party." Nonetheless, it was the same author of *Titan* who later in *Farm Bureau* set forth this first factor in the balancing of the equities: whether the insurer could have discovered the basis for rescission before the innocent third party was injured. Thus, while the fact that the fraud was "easily ascertainable" is not a basis to automatically deny rescission, it remains a factor to be considered in the balancing of the equities. And, it would seem logical to conclude that the easier it would have been to discover in advance of injury, the greater it should weigh against rescission.

In sum, had defendant exercised due diligence, the insured's misrepresentations would have been discovered long before the accident occurred and the policy would have been rescinded before plaintiff provided any services to the insured.[36] For these reasons, the trial court correctly weighed the first factor in favor of plaintiff.

Turning to the second factor, whether the relationship between the fraudulent insured and the third-party would suggest that the third-party had knowledge of the fraud. The trial court concluded that there was no evidence that plaintiff was aware of Orr's fraud. It is unclear from defendant's brief whether defendant argues that this factor is either neutral or inapplicable when a medical provider is involved.[37] In any event, defendant points to no evidence suggesting that the trial court erred on this point and that plaintiff was actually complicit in Orr's fraud. Simply put, there is no reason to believe that plaintiff was aware of Orr's fraud until, after providing services for several months, defendant finally got around to rescinding the policy and denying plaintiff's claims.

Turning to the third factor, whether the innocent third-party acted negligently or recklessly in the course of the injury-causing event, the trial court concluded that plaintiff was not reckless or negligent, specifically stating that it was not convinced that plaintiff was negligent or reckless in not contacting defendant after receiving the first Explanation of Benefits (EOB) in October 2021. The trial court weighed this factor in favor of plaintiff. Interestingly, defendant does not pick up on the trial court's suggestion (albeit one that the trial court rejected) that plaintiff's failure to immediately question the denial of the claim in the initial EOB as potentially providing an argument of negligence. Rather, defendant steadfastly sticks to its position that the "injury" that must be analyzed is the physical injury to the insured in the accident, rather than, as discussed, the financial injury to plaintiff as being the relevant point of analysis. This leads to defendant merely arguing that because it is highly unlikely that the medical provider would ever be the person who caused the motor vehicle accident, this factor must always be considered inapplicable to medical providers bringing claims.

---

[36] For that matter, even if defendant had rescinded the policy on the day that Orr's driving record was actually retrieved and the misrepresentations discovered by the third-party claims administrator, plaintiff would have only rendered minimal services as that was the same day that Orr's treatment with plaintiff began.

[37] As noted above, defendant argues that three or four of the factors will almost always be inapplicable or neutral, identifying factors four and five as the outliers. But in its discussion of factor two, defendant notes the trial court's conclusion that plaintiff's relationship with Orr would not have given rise to plaintiff being aware of the misrepresentation. Defendant then states, with emphasis, that "this will always be the case where the purposed 'innocent third party' is a medical provider." It is unclear whether defendant is now conceding the point that this factor will always weigh against the insurer where medical providers are involved, or if defendant is arguing that, because it would almost always be the case that it would weigh against the insurer, this factor should be deemed inapplicable (or at least neutral) in cases involving medical providers.

-10-

We accept the trial court's conclusion that this factor weighs in favor of plaintiff. There is perhaps an interesting argument to be made regarding whether the medical provider should have some responsibility in raising the issue of the denial of a claim in a timely manner. But defendant neither raises this argument nor challenges the trial court's conclusion. It should also be noted that plaintiff had provided a significant amount of services before receiving the EOB referenced in the trial court's opinion.

Notably, defendant did not raise this in their motion for summary disposition. Indeed, the first mention of any EOB denying a claim appears to have come from plaintiff's counsel at the argument on the motion. And that was in the context of plaintiff having provided services and receiving EOBs but that the EOBs made no mention of a rescission. The trial court inquired of plaintiff's counsel whether there was mention of rescission, to which counsel replies "absolutely not." Indeed, the trial court's initial reference in its opinion to an October 2021 EOB states that defendant sent an EOB to plaintiff indicating that the "claim is pending compensability." Attached to plaintiff's response brief in the trial court to the motion for summary disposition as Exhibit D are three EOBs, the first dated 10/4/2021 and two dated 1/10/2022. All three include the notation, "This claim is pending compensability, by carrier." And the last two are dated approximately three weeks *after* defendant sent the rescission letter to Orr.[38] Thus, not only was plaintiff not aware of Orr's misrepresentation when they began providing services, plaintiff was not made aware of it when defendant actually rescinded the policy. And, for that matter, an EOB dated March 30, 2022 (which plaintiff states is the first EOB actually denying a claim), states that the claim (for services rendered on December 14) was denied because the "claim is not covered, per carrier." Even that EOB does not reference the policy being rescinded.

The fourth factor considers whether rescission would leave the third-party without a means of recovery. The trial court weighed this factor in favor of defendant noting that plaintiff could recover its outstanding bills from either Orr or the Michigan Assigned Claims Facility (MACF). Defendant obviously does not challenge this conclusion. Defendant does additionally argue that a provider's ability to recover from the MACF or the insured is a basis for concluding that the equities should always be balanced in favor of the insurer. This merely shifts the liability to another insurer (MACF) or to the insured. But as to the insured, the insurer presumably has the same ability to pursue recovery as does the provider. That is, if the insured procured the policy through fraud and the insurer is then obligated to pay a claim, presumably the insurer now has a fraud claim that it may pursue against the insured. And defendant was the party that was in the best position to have avoided that loss in the first place—had it actually investigated plaintiff's driving record before issuing the policy, it never would have been liable for the claim.

---

[38] In its brief on appeal, defendant questions how its statement on the EOB that the claim was "pending compensability" could be regarded as contrary to rescission while it was investigating the compensability of the claim. We are at a loss to understand what investigation was necessary to determine whether the policy should be rescinded beyond the information that Orr's driver's license had been suspended. Certainly, defendant provides no explanation of how complicated of an investigation it conducted.

The fifth factor concerns whether enforcing the policy would cause the insurer to have to provide tort liability for an at-fault insured. The trial court weighed this factor in favor of plaintiff because there was no evidence that Orr was at fault in the accident nor would Orr have any tort liability to plaintiff. Defendant, on the other hand, argues that this factor weighs heavily in favor of rescission, stating the it virtually always will. Specifically, defendant argues that the only effect of enforcing the policy on behalf of plaintiff is to relieve Orr, or any other medical insurer that she may contract with, of liability. Again, this overlooks the fact that this factor deals with tort liability, not PIP benefits. Moreover, as briefly discussed above, it would not preclude defendant from seeking redress against Orr in a claim for fraud. But perhaps most importantly is that denying rescission in favor of plaintiff might prompt the insurer to timely attend to its own responsibilities. Defendant should have reviewed Orr's driver's license record when it received Orr's application and not wait until five months later after a claim arose. And, even at that point, it should have promptly rescinded the policy upon discovering the misrepresentation, putting plaintiff on notice that no further services would have been compensable. Had defendant acted with reasonable promptness, plaintiff would have provided significantly less services or possibly even none at all. Perhaps this factor in this circumstance should be rephrased to ask whether denying rescission would cause an insurer to act promptly to determine if it were going to rescind a policy. Or, for that matter, to promptly notify a provider that it was denying a claim based upon the insured's misrepresentation rather than merely listing it as "pending."

In sum, we conclude that a balancing of the equities weighs heavily in favor of denying rescission as it applies to plaintiff's claims for services rendered before plaintiff received notice that defendant was rescinding Orr's policy due to misrepresentation in the application. As between the parties, it was defendant who was in the best position to discover Orr's misrepresentation. Had defendant reviewed Orr's driving record at the time the application was submitted, it could have rescinded the policy several months in advance of the accident. And, even having waited until the accident occurred to review Orr's driving record, it could have rescinded the policy shortly after the accident and precluded plaintiff rendering a vast majority of the services while under the belief that Orr was covered by insurance. This latter point was compounded by the fact that even after notifying Orr that it was rescinding the policy, defendant's EOBs to plaintiff listed the claims as pending rather than informing plaintiff that defendant was rescinding the policy.

In conclusion, the trial court properly denied summary disposition as defendant has not established a lack of genuine issue of material fact that the balancing of the equities must weigh in favor of rescission. Regardless whether this case is treated as one of equitable rescission or contractual rescission, the equities must be balanced and, in doing so, the trial court correctly weighed the equities in favor of plaintiff.

Affirmed. Plaintiff may tax costs.

/s/ Kathleen A. Feeney
/s/ Michael J. Kelly
/s/ Michelle M. Rick